# IN THE SUPREME COURT OF IOWA

No. 11–1339

Filed July 18, 2014

Amended September 30, 2014

**STATE OF IOWA,**

> Appellee,

vs.

**ANDRE JEROME LYLE JR.,**

> Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Robert A. Hutchison, Judge.

A juvenile challenges his sentence as cruel and unusual under the State and Federal Constitutions. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT SENTENCE VACATED; CASE REMANDED.**

Mark C. Smith, State Appellate Defender, David A. Adams (until withdrawal), Vidhya K. Reddy (until withdrawal), and Rachel C. Regenold, Assistant State Appellate Defenders, for appellant.

Thomas J. Miller, Attorney General, Elisabeth S. Reynoldson (until withdrawal), Benjamin M. Parrott (until withdrawal), and Darrel L. Mullins, Assistant Attorneys General, John P. Sarcone, County Attorney,

Frank Severino Jr. and Jeffrey K. Noble, Assistant County Attorneys, for appellee.

**CADY, Chief Justice.**

In this appeal, a prison inmate who committed the crime of robbery in the second degree as a juvenile and was prosecuted as an adult challenges the constitutionality of a sentencing statute that required the imposition of a mandatory seven-year minimum sentence of imprisonment. The inmate was in high school at the time of the crime, which involved a brief altercation outside the high school with another student that ended when the inmate took a small plastic bag containing marijuana from the student. He claims the sentencing statute constitutes cruel and unusual punishment in violation of the State and Federal Constitutions when applied to all juveniles prosecuted as adults because the mandatory sentence failed to permit the court to consider any circumstances based on his attributes of youth or the circumstances of his conduct in mitigation of punishment. For the reasons expressed below, we hold a statute mandating a sentence of incarceration in a prison for juvenile offenders with no opportunity for parole until a minimum period of time has been served is unconstitutional under article I, section 17 of the Iowa Constitution.[1] Accordingly, we vacate the sentence and remand the case to the district court for resentencing. Importantly, we do not hold that juvenile offenders cannot be sentenced to imprisonment for their criminal acts. We do not hold juvenile

---

[1]Throughout our opinion today, we use both "juvenile" and "child" to describe youthful offenders. We recognize a statute of the Iowa Code defines "child" as "any person under the age of fourteen years." Iowa Code § 702.5 (2011). Nonetheless, we believe our use of the term "child" today is appropriate. In a different section, the Code defines "child" as "a person under eighteen years of age." *See id.* § 232.2(5). Moreover, we are hardly the first court to equate juveniles and children for the purposes of constitutional protection. *See Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 2468, 183 L. Ed. 2d 407, 422–23 (2012) ("So *Graham* and *Roper* and our individualized sentencing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult.").

offenders cannot be sentenced to a minimum term of imprisonment. We only hold juvenile offenders cannot be mandatorily sentenced under a mandatory minimum sentencing scheme.

## I. Background Facts and Prior Proceedings.

Andre Lyle Jr. was convicted following a jury trial of the crime of robbery in the second degree on June 29, 2011. *See* Iowa Code §§ 711.1–.3 (2011). He was a seventeen-year-old high school student when he committed the crime. The conviction resulted from an incident in October 2010 when Lyle and a companion punched another young man and took a small bag of marijuana from him. The altercation between the boys occurred outside the high school they attended after the victim failed to deliver marijuana to Lyle and his companion in exchange for $5 they had given the victim the previous day. Lyle videoed the confrontation on his cell phone. Prior to trial, Lyle unsuccessfully sought to transfer jurisdiction of the matter to the juvenile court.

Lyle grew up in Des Moines with little family support and few advantages. His father was in prison, and he was raised by his grandmother after his mother threatened him with a knife. His grandmother permitted him to smoke marijuana, and he was frequently tardy or absent from school. Lyle had frequent contact with law enforcement and first entered the juvenile justice system at twelve years of age. He was involved in many criminal acts as a teenager, including assaults and robberies. Lyle was known to record his criminal behavior with his cell phone and post videos on the Internet.

Lyle appeared before the district court for sentencing on his eighteenth birthday. The district court sentenced him to a term of incarceration in the state corrections system not to exceed ten years. *See id.* § 711.3 ("Robbery in the second degree is a class 'C' felony."); *id.*

§ 902.9(4) ("A class 'C' felon, not a habitual offender, shall be confined no more than ten years . . . ."). Pursuant to Iowa statute, the sentence was mandatory, and he was required to serve seventy percent of the prison term before he could be eligible for parole. *See id.* § 902.12(5) ("A person serving a sentence for conviction of [robbery in the second degree in violation of section 711.3] shall be denied parole or work release unless the person has served at least seven-tenths of the maximum term of the person's sentence . . . .").

Lyle objected to the seventy percent mandatory minimum sentence. He claimed it was unconstitutional as applied to juvenile offenders. The district court overruled Lyle's objection.

Lyle appealed. In his initial appellate brief, Lyle disclaimed a categorical challenge to mandatory minimums and instead argued the mandatory minimum was unconstitutional as applied to him. We transferred the case to the court of appeals.

During the pendency of the appeal, the United States decided *Miller v. Alabama,* 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). In *Miller,* the Court held a statutory schema that mandates life imprisonment without the possibility of parole cannot constitutionally be applied to a juvenile. 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424. Subsequently, we held the rule contemplated by *Miller* was retroactive. *State v. Ragland,* 836 N.W.2d 107, 117 (Iowa 2013). We then applied the reasoning in *Miller* to sentences that effectively deprived a juvenile offender of a meaningful opportunity for early release on parole during the offender's lifetime based on demonstrated maturity and rehabilitation. *State v. Null,* 836 N.W.2d 41, 72 (2013). In a trilogy of cases, our reasoning applied not just to a de facto life sentence or one "that is the practical equivalent of a life sentence without parole," *see*

*Ragland*, 836 N.W.2d at 121, but also to a "lengthy term-of-years sentence," *Null*, 836 N.W.2d at 72; *see also State v. Pearson*, 836 N.W.2d 88, 96–97 (Iowa 2013).

The court of appeals affirmed the sentence. Lyle sought further review and asserted the decision of the court of appeals was contrary to *Miller*. We granted his application for further review and ordered Lyle and the State to submit additional briefing regarding whether the seventy percent mandatory minimum of his ten-year sentence for second-degree robbery was constitutional in light of our recent trilogy of cases. *See generally Ragland*, 836 N.W.2d 107, *Pearson*, 836 N.W.2d 88, *Null*, 836 N.W.2d 41.

## II.  Scope and Standard of Review.

An unconstitutional sentence is an illegal sentence. *See State v. Bruegger*, 773 N.W.2d 862, 872 (Iowa 2009). Consequently, an unconstitutional sentence may be corrected at any time. *Id.*; *see also* Iowa R. Crim. P. 2.24(5)(*a*). Although challenges to illegal sentences are ordinarily reviewed for correction of legal errors, we review an allegedly unconstitutional sentence de novo. *Ragland*, 836 N.W.2d at 113.

## III.  Issue Before the Court.

As a threshold matter, the State argues Lyle waived a categorical challenge by failing to raise it in his initial brief. We have consistently held an issue "may be deemed" waived if a litigant fails to identify the issue, assign error, and make an argument supported by citation to authority in their initial brief. *See Bennett v. MC No. 619, Inc.*, 586 N.W.2d 512, 521 (Iowa 1998); *Mueller v. St. Ansgar State Bank*, 465 N.W.2d 659, 659 (Iowa 1991); *McCleeary v. Wirtz*, 222 N.W.2d 409, 415 (Iowa 1974). This rule, however, like most other rules, is not without exceptions. *See, e.g., State v. Carroll*, 767 N.W.2d 638, 644–45 (Iowa

2009) (addressing an issue raised for the first time in the State's appellee brief, which the defendant would have been unlikely to be able to address).  *But see Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 642 (Iowa 1996) (holding a civil litigant may not raise an issue for the first time in its reply brief).

Our decision in *Bruegger*—a case in which the defendant challenged his sentence as unconstitutional for the first time on appeal—reveals one exception.  773 N.W.2d at 872 ("[A] claim [that the sentence itself is inherently illegal] may be brought at any time."); *see also* Iowa R. Crim. P. 2.24(5)(*a*) ("The court may correct an illegal sentence at any time.").  *Bruegger* recognized that a categorical challenge to the constitutionality of a sentence under the Eighth Amendment or article I, section 17 targets "the inherent power of the court to impose a particular sentence."  *Bruegger*, 773 N.W.2d at 871.  As such, "the ordinary rules of issue preservation do not apply."  *Veal v. State*, 779 N.W.2d 63, 65 (Iowa 2010).  Accordingly, a constitutional challenge to an illegal sentence, even one brought *after* the initial brief has been filed, could fit within our holding in *Bruegger*.  *See* 773 N.W.2d at 871–72.

On the other hand, we recently recognized the value of a " 'procedurally conservative approach' " to error preservation involving novel issues raised for the first time on appeal for which there is an inadequate factual record.  *See State v. Hoeck*, 843 N.W.2d 67, 71 (Iowa 2014) (quoting Barry A. Miller*, Sua Sponte Appellate Rulings: When Courts Deprive Litigants of an Opportunity to Be Heard*, 39 San Diego L. Rev. 1253, 1300 (2002)).  We expressed skepticism about deciding the issue under those circumstances: "[W]e are not convinced the claims are fully briefed or the factual issues necessary to decide the Iowa constitutional claims are developed."  *Id.*  Accordingly, we remanded the

case to the district court to allow the parties to fully develop and argue the claims. *Id.* at 72.

Yet, as in *Bruegger* and *Veal,* our decision in *Hoeck* acknowledges that the failure to raise an issue in the initial appellate brief does not waive the issue. We preserved the issue in *Hoeck* pending briefing of legal issues and development of the factual record by the parties and consideration by the district court. *See id.* Instead, *Hoeck* recognized a commonsense prudential notion that remand is a more practicable decision than evaluation of an entirely novel constitutional issue upon an undeveloped record. *See id.*

The concerns we identified in *Hoeck* are not present in this case. The issue presented by Lyle in this case on further review (and more thoroughly in response to our order for supplemental briefing) is fundamentally similar to the one he initially raised on appeal. *See Feld v. Borkowski,* 790 N.W.2d 72, 84–85 (Iowa 2010) (Appel, J., concurring in part and dissenting in part). While disclaiming a categorical challenge, Lyle's initial brief suggests mandatory minimums are grossly disproportionate for most or all juveniles. This argument is fundamentally similar to the argument he expanded upon in his application for further review (after the Supreme Court's decision in *Miller*) and that he ultimately articulated in his supplemental brief. The supplemental briefing we ordered, combined with the categorical nature of the relief Lyle seeks also obviates in this narrow circumstance the need for more thorough briefing in the district court. Accordingly, we proceed to consider Lyle's categorical challenge based on *Miller* and our trilogy of cases.

**IV. Merits.**

Lyle contends the prohibition against cruel and unusual punishment in the Iowa Constitution does not permit a statutory scheme that mandates a person sentenced for a crime committed as a juvenile to serve a minimum period of time prior to becoming eligible for parole or work release. The State argues a mandatory minimum sentence of the term of years for the crime committed in this case is not cruel and unusual.

The Iowa Constitution provides, "Excessive bail shall not be required; excessive fines shall not be imposed, and cruel and unusual punishment shall not be inflicted." Iowa Const. art. I, § 17. The Eighth Amendment similarly prohibits excessive punishments. *See* U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").[2] Lyle does not offer a substantive standard for cruel and unusual punishment that differs from the one employed by the United States Supreme Court.

---

[2]Similarity between federal and state constitutional provisions does not require us to follow federal precedent interpreting the Federal Constitution. Instead, "[a] decision of this court to depart from federal precedent arises from our independent and unfettered authority to interpret the Iowa Constitution." *Null*, 836 N.W.2d at 70 n.7; *see also State v. Baldon*, 829 N.W.2d 785, 790 (Iowa 2013) ("[O]ur right under principles of federalism to stand as the final word on the Iowa Constitution is settled, long-standing, and good law."). Indeed, we have not hesitated to do so when, after applying the now-familiar *Tonn–Ochoa* analysis, we have determined the liberty and equality of Iowans is better served by departing from the federal rule. *See, e.g., Null*, 836 N.W.2d at 70–74 & n.7 (extending, under article I, section 17, the rationale of *Miller* to sentences that are equivalent to life without parole); *State v. Kern*, 831 N.W.2d 149, 170–72 (Iowa 2013) (declining to adopt a special-needs exception for searches of the homes of parolees under article I, section 8); *Baldon*, 829 N.W.2d at 802–03 (holding a parole agreement does not establish consent to a warrantless, suspicionless search under article I, section 8); *State v. Ochoa*, 792 N.W.2d 260, 291 (Iowa 2010) (holding parole status does not alone permit a warrantless, suspicionless search under article I, section 8); *State v. Cline*, 617 N.W.2d 277, 293 (Iowa 2000) (holding article I, section 8 does not contain a good-faith exception to the exclusionary rule), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001).

Instead, he asks us to apply the federal framework in a more stringent fashion. *See Null,* 836 N.W.2d at 70 (applying the principles espoused in *Miller* in a more stringent fashion under the Iowa Constitution than had been explicitly adopted by the United States Supreme Court under the United States Constitution); *Bruegger,* 773 N.W.2d at 883. Thus, we follow the federal analytical framework in deciding this case, but ultimately use our judgment in giving meaning to our prohibition against cruel and unusual punishment in reaching our conclusion. *See State v. Kern,* 831 N.W.2d 149, 174 (Iowa 2013).

Article I, section 17 of the Iowa Constitution "embraces a bedrock rule of law that punishment should fit the crime." *Bruegger,* 773 N.W.2d at 872; *see also Roper v. Simmons,* 543 U.S. 551, 560, 125 S. Ct. 1183, 1190, 161 L. Ed. 2d 1, 16 (2005) ("[T]he Eighth Amendment guarantees individuals the right not to be subjected to excessive sanctions."); *Atkins v. Virginia,* 536 U.S. 304, 311, 122 S. Ct. 2242, 2246, 153 L. Ed. 2d 335, 344 (2002) (" '[I]t is a precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " (quoting *Weems v. United States,* 217 U.S. 349, 367, 30 S. Ct. 544, 549, 54 L. Ed. 793, 798 (1910)). While "strict proportionality" is neither required nor, frankly, possible, *Harmelin v. Michigan,* 501 U.S. 957, 1001, 111 S. Ct. 2680, 2705, 115 L. Ed. 2d 836, 869 (1991), *Bruegger* reveals our scrutiny of the proportionality between the crime and the sentence is not " 'toothless,' " 773 N.W.2d at 883 (quoting *Racing Ass'n of Cent. Iowa v. Fitzgerald,* 675 N.W.2d 1, 9 (Iowa 2004)).

Time and experience have taught us much about the efficacy and justice of certain punishments. As a consequence, we understand our concept of cruel and unusual punishment is "not static." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S. Ct. 590, 598, 2 L. Ed. 2d 630, 642 (1958).

Instead, we consider constitutional challenges under the "currently prevail[ing]" standards of whether a punishment is "excessive" or "cruel and unusual." *Atkins*, 536 U.S. at 311, 122 S. Ct. at 2247, 153 L. Ed. 2d at 344. This approach is followed because the basic concept underlying the prohibition against cruel and unusual punishment "is nothing less than the dignity" of humankind. *Trop*, 356 U.S. at 100, 78 S. Ct. at 597, 2 L. Ed. 2d at 642. This prohibition "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id.* at 101, 78 S. Ct. at 598, 2 L. Ed. 2d at 642. "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.'" *Kennedy v. Louisiana*, 554 U.S. 407, 419, 128 S. Ct. 2641, 2649, 171 L. Ed. 2d 525, 538 (2008) (quoting *Furman v. Georgia*, 408 U.S. 238, 382, 92 S. Ct. 2726, 2800, 33 L. Ed. 2d 346, 432 (1972) (Burger, C.J., dissenting)). In other words, punishments once thought just and constitutional may later come to be seen as fundamentally repugnant to the core values contained in our State and Federal Constitutions as we grow in our understanding over time. *See Roper*, 543 U.S. at 574–75, 125 S. Ct. at 1198, 161 L. Ed. at 25 (abrogating *Stanford v. Kentucky*, 492 U.S. 361, 380, 109 S. Ct. 2969, 2980, 106 L. Ed. 2d 306, 325 (1989), which held a sixteen-year-old offender could be sentenced to be executed). As with other rights enumerated under our constitution, we interpret them in light of our understanding of today, not by our past understanding.

Until recently, there were two general classifications of cruel and unusual sentences. *See Graham v. Florida*, 560 U.S. 48, 59, 130 S. Ct. 2011, 2021, 176 L. Ed. 2d 825, 836 (2010). "In the first classification

the Court consider[ed] all of the circumstances of the case to determine whether [a term-of-years] sentence is unconstitutionally excessive." *Id.* We recognize this classification under the Iowa Constitution, but refer to these sentences as "grossly disproportionate." *Bruegger*, 773 N.W.2d at 873. The second classification contemplated categorical bars to imposition of the death penalty irrespective of idiosyncratic facts. *Graham*, 560 U.S. at 60, 130 S. Ct. at 2022, 176 L. Ed. 2d at 836. This classification of cases has traditionally "consist[ed] of two subsets, one considering the nature of the offense, the other considering the characteristics of the offender." *Id.* In short, the death penalty simply cannot be imposed on certain offenders or for certain crimes. For instance, no offender can be sentenced to death—regardless of their personal characteristics—if only convicted of a nonhomicide offense and they did not intend to cause the death of another. *Kennedy*, 554 U.S. at 438, 128 S. Ct. at 2660, 171 L. Ed. 2d at 550. Additionally, a death penalty cannot be imposed, irrespective of the crime, on an intellectually disabled criminal offender, *Atkins*, 536 U.S. at 321, 122 S. Ct. at 2252, 153 L. Ed. 2d at 350, or a juvenile offender, *Roper*, 543 U.S. at 578, 125 S. Ct. at 1200, 161 L. Ed. 2d at 28.

*Graham* introduced a third subset of categorical challenges. *See* 560 U.S. at 70–74, 130 S. Ct. at 2028–30, 176 L. Ed. 2d at 843–45. This subset involved a categorical challenge to a term-of-years sentence based on the underlying sentencing practice. *See id.* at 61–62, 130 S. Ct. at 2022–23, 176 L. Ed. 2d at 837. While the juvenile status of the offender provided the pivotal point for the reasoning in *Graham*, the Court also recognized the offender was being sentenced to life without parole for a nonhomicide crime, a fact that itself entails categorically lesser culpability than a homicide crime. *See id.* at 71, 130 S. Ct. at 2028, 176

L. Ed. 2d at 842; *see also Kennedy,* 554 U.S. at 438, 128 S. Ct. at 2660, 171 L. Ed. 2d at 550 ("[Nonhomicide offenses] may be devastating in their harm . . . but 'in terms of moral depravity and of the injury to the person and to the public,' they cannot be compared to murder in their 'severity and irrevocability.' " (quoting *Coker v. Georgia,* 433 U.S. 584, 598, 97 S. Ct. 2861, 2869, 53 L. Ed. 2d 982, 993 (1977)).  The Court thus blended its two prior subsets of categorical challenges— consideration of the nature of the crime and consideration of the culpability of the offender—to generate a new subset.

Importantly, *Miller* added to this jurisprudence by conjoining two sets of caselaw: outright categorical prohibitions on certain punishments for certain crimes or against certain offenders, *e.g., Graham,* 520 U.S. at 75, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46; *Roper,* 543 U.S. at 578, 125 S. Ct. at 1200, 161 L. Ed. 2d at 28, with another line of cases requiring a sentencer have the ability to consider certain characteristics about the offender as mitigating circumstances in favor of not sentencing the offender to death, *e.g., Lockett v. Ohio,* 438 U.S. 586, 604, 98 S. Ct. 2954, 2964–65, 57 L. Ed. 2d 973, 990 (1978).  *See Miller,* 567 U.S. at ___, 132 S. Ct. at 2463–64, 183 L. Ed. 2d at 418.  Although *Miller* did not identify its holding as a categorical rule, it essentially articulated a categorical prohibition on a particular sentencing practice.  *See id.* at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424 ("We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders.").  Yet, *Miller* implemented a categorical prohibition by requiring the sentencing court to consider the offender's youth along with a variety of other individual facts about the offender and the crime to determine whether the sentence

is appropriate. *See id.* at \_\_\_, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423; *see also Ragland*, 836 N.W.2d at 115 & n.6.

By importing the line of cases represented by *Lockett*, *Miller* effectively crafted a new subset of categorically unconstitutional sentences: sentences in which the legislature has forbidden the sentencing court from considering important mitigating characteristics of an offender whose culpability is necessarily and categorically reduced as a matter of law, making the ultimate sentence categorically inappropriate. This new subset carries with it the advantage of simultaneously being more flexible and responsive to the demands of justice than outright prohibition of a particular penalty while also providing real and substantial protection for the offender's right to be sentenced accurately according to their culpability and prospects for rehabilitation. We turn now to consider the merits of Lyle's challenge that mandatory minimums cannot be constitutionally applied to juveniles.

The analysis of a categorical challenge to a sentence normally entails a two-step inquiry. First, we consider " 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue." *Graham*, 560 U.S. at 61, 130 S. Ct. at 2022, 176 L. Ed. 2d at 837 (quoting *Roper*, 543 U.S. at 563, 125 S. Ct. at 1191, 161 L. Ed. 2d at 17). Second, we exercise our own "independent judgment" "guided by 'the standards elaborated by controlling precedents and by [our] own understanding and interpretation of the [Iowa Constitution's] text, history, meaning, and purpose.' " *See id.* (quoting *Kennedy*, 554 U.S. at 421, 128 S. Ct. at 2650, 171 L. Ed. 2d at 540). In exercising independent judgment, we consider "the culpability of the

offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." *Id.* at 67, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841. We also consider if the sentencing practice being challenged serves the legitimate goals of punishment. *Id.*

Beginning with the first prong of the analysis, we recognize no other court in the nation has held that its constitution or the Federal Constitution prohibits a statutory schema that prescribes a mandatory minimum sentence for a juvenile offender. Further, most states permit or require some or all juvenile offenders to be given mandatory minimum sentences.[3] *See* Martin Guggenheim, Graham v. Florida *and a Juvenile's Right to Age-Appropriate Sentencing*, 47 Harv. C.R.-C.L. L. Rev. 457, 494 & n.267 (2012) [hereinafter Guggenheim] (collecting state statutes permitting or requiring a mandatory minimum sentences to be imposed on a juvenile offender tried as an adult). This state of the law arguably projects a consensus in society in favor of permitting juveniles to be given mandatory minimum statutory sentences. *See* Alex Dutton, Comment, *The Next Frontier of Juvenile Sentencing Reform: Enforcing* Miller*'s Individualized Sentencing Requirement Beyond the JLWOP Context*, 23 Temp. Pol. & Civ. Rts. L. Rev. 173, 195 (2013) [hereinafter Dutton] ("At this moment, no such national consensus exists against the

---

[3]Some states have limited or abolished mandatory minimums for juveniles. *See, e.g.*, Colo. Rev. Stat. § 19-2-908 (2013) (limiting the availability of mandatory minimum sentences for juveniles); Del. Code Ann. tit. 11, § 630A(c) (2007) (providing the mandatory minimum for vehicular homicide shall not apply to a juvenile offender); N.M. Stat. Ann. § 31-18-13(B) (West, Westlaw current through May 21, 2014) (providing that juvenile offenders may be sentenced to less than the mandatory minimum); Or. Rev. Stat. § 161.620 (2003) (providing a juvenile tried as an adult shall not receive a mandatory minimum sentence except for aggravated murder or felonies committed with a firearm); Wash. Rev. Code Ann. § 9.94A.540(3)(a) (West 2010) (prohibiting mandatory minimum sentences for juvenile offenders except for aggravated first-degree murder).

imposition of mandatory sentences on juvenile offenders; the practice is common across jurisdictions.").

Yet, "[c]onsensus is not dispositive." *Kennedy*, 554 U.S. at 421, 128 S. Ct. at 2650, 171 L. Ed. 2d at 539. Moreover, as *Miller* demonstrates, constitutional protection for the rights of juveniles in sentencing for the most serious crimes is rapidly evolving in the face of widespread sentencing statutes and practices to the contrary. *See* 567 U.S. at ___, 132 S. Ct. at 2470–73, 183 L. Ed. 2d at 424–29 (rejecting an argument by Alabama and Arkansas that widespread use of mandatory-life-without-parole sentences for juvenile homicide offenders precluded holding the practice to be unconstitutional). Additionally, the evolution of society that gives rise to change over time necessarily occurs in the presence of an existing consensus, as history has repeatedly shown. The "tough on crime" movement in politics may have made mandatory minimum sentences for juveniles common in society, *see* Dutton, Temp. Pol. & Civ. Rts. L. Rev. at 175 (identifying "conservative, tough-on-crime political campaigns" as one cause of harsh and longer juvenile sentences); *see also* William J. Stuntz, *The Pathological Politics of Criminal Law,* 100 Mich. L. Rev. 505, 509 (2001) (describing the bipartisan "bidding war" to be toughest on crime), but, the shift has also given rise to the claim that some sentencing laws have gone too far as applied to youthful offenders, *cf.* Guggenheim, 47 Harv. C.R.-C.L. L. Rev. at 495 (arguing the national-consensus analysis is inadequate to protect juvenile rights).

We also recognize that we would abdicate our duty to interpret the Iowa Constitution if we relied exclusively on the presence or absence of a national consensus regarding a certain punishment. Iowans have generally enjoyed a greater degree of liberty and equality because we do

not rely on a national consensus regarding fundamental rights without also examining any new understanding.

Nevertheless, the absence of caselaw does not necessarily support the presence of a consensus contrary to the challenge by Lyle in this case. Our legislature has already started to signal its independent concern with mandatory prison sentences for juveniles. In 2013, it expressed this recognition by amending a sentencing statute to remove mandatory sentencing for juveniles in most cases. This statute provides:

> Notwithstanding any provision in section 907.3 or any other provision of law prescribing a mandatory minimum sentence for the offense, if the defendant, other than a child being prosecuted as a youthful offender, is guilty of a public offense other than a class "A" felony, and was under the age of eighteen at the time the offense was committed, the court may suspend the sentence in whole or in part, including any mandatory minimum sentence, or with the consent of the defendant, defer judgment or sentence, and place the defendant on probation upon such conditions as the court may require.

2013 Iowa Acts ch. 42, § 14 (codified at Iowa Code Ann. § 901.5(14) (West, Westlaw current through 2014 Reg. Sess.)).[4] While this statute does not change the minimum-term requirement for juveniles if a prison sentence is imposed by the court, it does abolish mandatory prison sentencing for most crimes committed by juveniles.

Just as we typically "owe substantial deference to the penalties the legislature has established for various crimes," *State v. Oliver*, 812 N.W.2d 636, 650 (2012), we owe equal deference to the legislature when it expands the discretion of the court in juvenile sentencing. Legislative judgments can be "the most reliable objective indicators of community

---

[4]The State argues, and Lyle does not disagree, that the statute does not apply retroactively. *See* Iowa Code § 4.13(1)(*c*) (2013).

standards for purposes of determining whether a punishment is cruel and unusual." *Bruegger*, 773 N.W.2d at 873. Here, the legislative decision to back away from mandatory sentencing for most crimes committed by juveniles weakens the notion of a consensus in favor of the practice of blindly sentencing juveniles based on the crime committed. In fact, it helps illustrate a building consensus in this state to treat juveniles in our courts differently than adults.

Actually, the statutory recognition of the need for some discretion when sentencing juveniles is consistent with our overall approach in the past in dealing with juveniles. Primarily, the juvenile justice chapter of our Code gives courts considerable discretion to take action in the best interests of the child. *See, e.g.,* Iowa Code § 232.10(2)(*a*) (2013) (permitting a transfer of venue for juvenile court proceedings for "the best interests of the child" among other reasons); *id.* § 232.38(2) (permitting the district court to excuse temporarily the presence of the child's parents "when the court deems it in the best interests of the child"); *id.* § 232.43(6) (permitting the district court to refuse to accept a guilty plea by the child if the plea "is not in the child's best interest"); *id.* § 232.45(6)(*c*) (permitting the juvenile court to waive jurisdiction over delinquency proceedings if waiver "would be in the best interests of the child and the community"); *id.* § 232.52(2)(*e*) (permitting the court to transfer guardianship of the child to the department of human services for "the best interest of the child" among other reasons); *id.* § 232.62(2)(*a*) (permitting the district court to transfer venue for CINA proceedings for "the best interests of the child" among other reasons); *id.* § 232.108(3) (permitting a court to deny permission for "frequent visitation" by a sibling if the court determines "it would not be in the child's best interest").

Moreover, the Code in general is replete with provisions vesting considerable discretion in courts to take action for the best interests of the child. *See id.* § 92.13 (permitting the labor commissioner to refuse to grant a work permit to a minor if "the best interests of the minor would be served by such refusal"); *id.* § 232C.3(1) (permitting a court to emancipate a minor if it is in the best interest of the child); *id.* § 282.18(5) (directing a school board "to achieve just and equitable results that are in the best interest of the affected child" when determining whether to permit the child to open enroll). Other statutes prohibit juveniles from engaging in risky behavior because of the reduced capacity for decision-making found in juveniles. *See id.* § 123.47(2) (prohibiting persons under twenty-one from purchasing alcohol); *id.* § 135.37(2) (prohibiting persons under eighteen from obtaining tattoos); *id.* § 321.180B (prohibiting persons under eighteen from obtaining "a license or permit to operate a motor vehicle except under the provisions of this section"); *id.* § 453A.2(2) (prohibiting persons under eighteen from purchasing tobacco products); *see also Null,* 836 N.W.2d at 53 (collecting statutes).

All of these statutes reflect a pair of compelling realities. First, children lack the risk-calculation skills adults are presumed to possess and are inherently sensitive, impressionable, and developmentally malleable. Second, the best interests of the child generally support discretion in dealing with all juveniles. In other words, "the legal disqualifications placed on children as a class . . . exhibit the settled understanding that the differentiating characteristics of youth are universal." *J.D.B. v. North Carolina,* 564 U.S. ___, ___, 131 S. Ct. 2394, 2403–04, 180 L. Ed. 2d 310, 324 (2011).

Overall, it is becoming clear that society is now beginning to recognize a growing understanding that mandatory sentences of imprisonment for crimes committed by children are undesirable in society. If there is not yet a consensus against mandatory minimum sentencing for juveniles, a consensus is certainly building in Iowa in the direction of eliminating mandatory minimum sentencing.[5]

We next turn to the second step in the analysis of the Cruel and Unusual Punishment Clause. We must decide if the mandatory minimum sentence for a youthful offender violates the Cruel and Unusual Punishment Clause in light of its text, meaning, purpose, and history.

---

[5]We recognize many states are currently wrestling with whether *Miller* applies retroactively on collateral review. *Compare Jones v. State*, 122 So. 3d 698, 702–03 (Miss. 2013) (holding *Miller* applies retroactively), *and State v. Mantich*, 842 N.W.2d 716, 731 (Neb. 2014) (same), *with State v. Tate*, 130 So. 3d 829, 841 (La. 2013) (holding *Miller* does not apply retroactively), *Chambers v. State*, 831 N.W.2d 311, 326 (Minn. 2013) (same), *and Commonwealth v. Cunningham*, 81 A.3d 1, 11 (Pa. 2013) (same). Of course, retroactivity aside, states must continue to find ways to implement *Miller*, and a variety of options exist. *See* Lauren Kinell, Note and Comment, *Answering the Unanswered Questions: How States Can Comport with* Miller v. Alabama, 13 Conn. Pub. Int. L.J. 143, 149–58 (2013) (discussing different approaches taken by states after *Miller*); Kelly Scavone, Note, *How Long Is Too Long: Conflicting State Responses to De Facto Life Without Parole Sentences After* Graham v. Florida *and* Miller v. Alabama, 82 Fordham L. Rev. 3439, 3441–42 (2014) (discussing varying state responses to issues left unresolved by *Miller*). Even these early days of rapidly evolving juvenile justice jurisprudence, though, we are hardly alone in our approach. For example, other courts have similarly held a term-of-years sentence can be so lengthy as to be the "functional equivalent" of a life sentence. *See Moore v. Biter*, 725 F.3d 1184, 1194 (9th Cir. 2013) (holding a 254-year sentence for nonhomicide crimes violated *Graham*); *People v. Caballero*, 282 P.3d 291, 295 (Cal. 2012) (holding a 110-year minimum sentence is the equivalent of life without parole); *see also Commonwealth v. Brown*, 1 N.E.3d 259, 270 n.11 (Mass. 2013) (leaving the contours of a new sentencing scheme to the "sound discretion" of the legislature but cautioning that any sentencing scheme "must take account of the spirit" of *Brown* "and avoid imposing on juvenile defendants any term so lengthy that it could be seen as the functional equivalent of a sentence of life without parole" and citing *Caballero*, *Ragland*, and *Null*). Indeed, Massachusetts has even gone a step further than we have had occasion to do, holding all juvenile life without parole for homicide offenders violates the Massachusetts Constitution. *See Diatchenko v. Dist. Att'y*, 1 N.E.3d 270, 284–85 (Mass. 2013).

In doing so, we cannot ignore that over the last decade, juvenile justice has seen remarkable, perhaps watershed, change. This evolution must be cast in its proper place in the history of juvenile justice. Although we have recently traced the evolution of juvenile justice, *see Null*, 836 N.W.2d at 52, we highlight this history to better understand the challenge made in this case by Lyle. This history is particularly salient given the categorical nature of Lyle's challenge. It reveals children and juveniles have been viewed as constitutionally different from adults in this country for more than a century.

At common law, children under seven lacked criminal capacity, and children between seven and fourteen years of age were presumed to lack criminal capacity, but juveniles over fourteen were presumed to have the capacity to commit criminal acts. *Id.*; *see also In re Gault*, 387 U.S. 1, 16, 87 S. Ct. 1428, 1438, 18 L. Ed. 2d 527, 540 (1967). "For the first hundred years or so after the founding of the United States, juveniles, if they were tried at all, were tried in adult courts." *Null*, 836 N.W.2d at 52 (citing Barry C. Feld, *Unmitigated Punishment: Adolescent Criminal Responsibility and LWOP Sentences*, 10 J.L. & Fam. Stud. 11, 13–14 (2007) [hereinafter Feld]). While these early courts typically did not have authority to accord the juvenile fewer rights, *In re Gault*, 387 U.S. at 16–17, 87 S. Ct. at 1438, 18 L. Ed. 2d at 540, courts did not afford juveniles any greater substantive protection. "Prior to the creation of juvenile courts, 'adult crime' meant 'adult time,' therefore states tried and sentenced children as adults, and imprisoned and executed them for crimes committed as young as ten, eleven, or twelve years of age." Feld, 10 J.L. & Fam. Stud. at 14.

By the end of the nineteenth century, progressive reformers were "appalled by adult procedures and penalties, and by the fact that

children could be given long prison sentences and mixed in jails with hardened criminals." *In re Gault*, 387 U.S. at 15, 87 S. Ct. at 1437, 18 L. Ed. 2d at 539. To ameliorate the harshness and inequity of trying children in adult courts (resulting in adult punishment), reformers advocated for the establishment of a system less concerned with ascertaining the child's guilt or innocence and more concerned with determining what was in the child's best interests based upon the child's unique circumstances. *Id.* at 15–16, 87 S. Ct. at 1437, 18 L. Ed. 2d at 539. "The idea of crime and punishment was to be abandoned. The child was to be 'treated' and 'rehabilitated' and the procedures, from apprehension through institutionalization, were to be 'clinical' rather than punitive." *Id.* "Accordingly, the highest motives and most enlightened impulses led to a peculiar system for juveniles, unknown to our law in any comparable context." *Id.* at 17, 87 S. Ct. at 1438, 18 L. Ed. 2d at 540. Theoretically, youthful offenders would not face any actual prison time as a result of most juvenile court proceedings. *See* Julian W. Mack, *The Juvenile Court*, 23 Harv. L. Rev. 104, 108 (1909) [hereinafter Mack] ("[T]he protection is accomplished by suspending sentence and releasing the child under probation, or, in the case of removal from the home, sending it to a school instead of to a jail or penitentiary.").

Underlying these early juvenile courts was the fundamental conceit that the judicial process was not adversarial when dealing with juvenile offenders. Instead, the state ostensibly acted in *parens patriae* on the child's behalf. *See In re Gault*, at 15–17, 87 S. Ct. at 1437–38, 18 L. Ed. 2d at 539–40. In turn, procedural protections for the benefit of criminal defendants did not apply in juvenile court. *Id.* at 15–16, 87 S. Ct. at 1437, 18 L. Ed. 2d at 539. The old law reasoned the child had

no right of liberty with his or her parents, only a right to custody, and thus, in delinquency proceedings, the state did "not deprive the child of any rights, because he ha[d] none. It merely provide[d] the 'custody' to which the child [was] entitled." *Id.* at 17, 87 S. Ct. at 1438, 18 L. Ed. 2d at 540. In other words, the state, by prosecuting the child in juvenile court, was stepping in as the child's caretaker. *See* Mack, 23 Harv. L. Rev. at 120.

Sensing the changing perceptions about liberty and due process in the middle of the twentieth century, the United States Supreme Court recognized the basic prevailing underpinning of juvenile courts was inaccurate and "that the purpose of juvenile court proceedings was no longer primarily to protect the best interest of the child and was instead becoming more punitive in nature." *Null*, 836 N.W.2d at 52; *see In re Gault*, 387 U.S. at 17–19, 87 S. Ct. at 1438–39, 18 L. Ed. 2d at 540–41. Accordingly, the Court began to require many basic protections provided to adult offenders to be offered in juvenile courts, *see In re Gault*, 387 U.S. at 32–58, 87 S. Ct. at 1446–60, 18 L. Ed. 2d at 549–63, and in proceedings in which the juvenile is waived to adult court, *see Kent v. United States*, 383 U.S. 541, 556–57, 86 S. Ct. 1045, 1055, 16 L. Ed. 2d 84, 94–95 (1966).

Following *In re Gault*, however, little additional progress was achieved. *See* Guggenheim, 47 Harv. C.R.-C.L. L. Rev. at 466–74. State legislatures generally responded to *Kent* and *In re Gault* by amending their laws to prosecute more juveniles as adults in adult court and to give more juveniles adult sentences. *See id.* at 472–74; Donna M. Bishop, *Juvenile Offenders in the Adult Criminal Justice System*, 27 Crime & Just. 81, 84 (2000). As we have recognized "*Kent* and *In re Gault* may have stimulated a mindset of increased exposure of youth to adult

criminal sentences." *Null*, 836 N.W.2d at 52; *see* Feld, 10 J.L. & Fam. Stud. at 31 & n.108 (detailing the alarmist, racially charged rhetoric that fueled ever harsher sentences); *see also* John J. Dilulio Jr., *The Coming of the Super-Predators*, The Weekly Standard, November 27, 1995, at 23) (predicting an onslaught of "tens of thousands of severely morally impoverished juvenile super-predators"). The increase in harsh sentencing statutes has led to longer sentences for juveniles.

Nevertheless, the Court did recognize serious differences in juveniles that supported differential treatment in a few cases. *See Johnson v. Texas*, 509 U.S. 350, 367, 113 S. Ct. 2658, 2668–69, 125 L. Ed. 2d 290, 306 (1993) (holding "sentence in a capital case must be allowed to consider the mitigating qualities of youth"); *Thompson v. Oklahoma*, 487 U.S. 815, 836–38, 108 S. Ct. 2687, 2699–2700, 101 L. Ed. 2d 702, 719–20 (1988) (plurality opinion) (holding death penalty for offenses committed by persons under sixteen years of age an "unconstitutional punishment"); *Schall v. Martin*, 467 U.S. 253, 265–67, 104 S. Ct. 2403, 2410–11, 81 L. Ed. 2d 207, 217–19 (1984) (subordinating, in appropriate circumstances, juvenile's liberty interest to state's *parens patriae* interest); *Eddings v. Oklahoma*, 455 U.S. 104, 115–16, 102 S. Ct. 869, 877, 71 L. Ed. 2d 1, 11–12 (1982) (remanding for state court to consider mitigating circumstances of death penalty case of sixteen-year-old youth). Importantly, the reasoning in *Schall*, which permitted pretrial detention of youthful offenders under circumstances not permissible of adults, was based on the notion that juveniles fail to appreciate the gravity of the situation of prosecution—presumably making them likely to reoffend even before trial. *See* 467 U.S. at 265, 104 S. Ct. at 2410, 81 L. Ed. 2d at 217–18. The Court recognized that "[c]hildren, by definition, are not assumed to have the capacity to take

care of themselves." *Id.* It further recognized that "[s]ociety has a legitimate interest in protecting a juvenile from the consequences of his criminal activity [including] . . . the downward spiral of criminal activity in which peer pressure may lead the child." *Id.* at 266, 104 S. Ct. at 2410–11, 81 L. Ed. 2d at 218. *Schall* suggested that juveniles necessitate special treatment because the consequences of criminal conduct impact them differently than adults.

In the context of capital murder, the Court recognized the importance of youth as a mitigating factor. *See Eddings*, 455 U.S. at 115–17, 102 S. Ct. at 877–78, 71 L. Ed. 2d at 11–12. The Court explained:

> [Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults.

*Id.* at 115–16, 102 S. Ct. at 877, 71 L. Ed. 2d at 11 (footnote omitted). Further, the Court found that the presence of evidence of other types of mitigating factors, such as a "turbulent family history, . . . beatings by a harsh father, and . . . severe emotional disturbance" was relevant when the defendant is a juvenile. *See id.* at 115, 102 S. Ct. at 877, 71 L. Ed. 2d at 11.

Indeed, the Court arrived at a similar conclusion in barring imposition of the death penalty on juvenile offenders who were under the age of sixteen at the time of the offense. *See Thompson*, 487 U.S. at 836–38, 108 S. Ct. at 2699–2700, 101 L. Ed. 2d at 719–20. Justice Stevens, writing for a plurality of the Court, explained two principal social purposes justify imposition of the death penalty: retribution and deterrence. *Id.* at 836, 108 S. Ct. at 2699, 101 L. Ed. 2d at 719.

However, neither of these rationales applied to fifteen-year-old offenders. *Id.* at 836–38, 108 S. Ct. at 2699–2700, 101 L. Ed. 2d at 719–20.

The reasoning employed by the plurality was strikingly similar to the reasoning and language used by the later majority in *Roper*. *Compare id.* at 836–37, 108 S. Ct. at 2699–2700, 101 L. Ed. 2d at 719 ("Given the lesser culpability of the juvenile offender, the teenager's capacity for growth, and society's fiduciary obligations to its children, [the retributive justification for imposing the death penalty] is simply inapplicable to . . . a 15-year-old offender."), *with Roper*, 543 U.S. at 569–71, 125 S. Ct. at 1195, 161 L. Ed. 2d at 21 (recognizing the "diminished culpability of juveniles" and their greater capacity for rehabilitation due to "transient immaturity" made the death penalty categorically inappropriate for juvenile offenders generally). Indeed, the idea that deterrence—a more relevant rationale for punishing lesser crimes—applied to juveniles was rejected nearly out of hand by the plurality: "The likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Thompson*, 487 U.S. at 837, 108 S. Ct. at 2700, 101 L. Ed. 2d at 720.

*Eddings* and *Thompson* demonstrate that while our emerging knowledge of adolescent neuroscience and the diminished culpability of juveniles is indeed compelling, *see Thompson*, 487 U.S. at 836, 108 S. Ct. at 2699–2700, 101 L. Ed. 2d at 719; *Eddings*, 455 U.S. at 115–16, 102 S. Ct. at 877, 71 L. Ed. 2d at 11–12, our commonsense understanding of youth, *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418, or what "any parent knows," *Roper*, 543 U.S. at 569, 125 S. Ct. at 1195, 161 L. Ed. 2d at 21, has for more than thirty years supported a fundamental and virtually inexorable difference between

juveniles and adults for the purposes of punishment. The understanding that it was cruel and unusual punishment to mandate the same sentences for juveniles as adults first emerged for crimes involving death sentences. We simply could no longer see death as an acceptable punishment to impose for a crime committed by a juvenile irrespective of the offender's youth.

Yet, for the bulk of the time after *Eddings* and *Thompson* and before *Roper*, a different categorical rule prevailed: the notion "that the penalty of death is qualitatively different from a sentence of imprisonment, however long." *See Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944, 961 (1976) (plurality opinion). The "death is different" rule manifested itself in extreme deference to legislative judgments regarding the appropriate duration of punishments for juveniles for other crimes. So long as the juvenile would not be executed, virtually any sentence or statutory sentencing scheme was acceptable. *See* Rachel E. Barkow, *The Court of Life and Death: The Two Tracks of Constitutional Sentencing Law and the Case for Uniformity*, 107 Mich. L. Rev. 1145, 1145 (2009) ("The Supreme Court takes two very different approaches to substantive sentencing law. Whereas its review of capital sentences is robust, its oversight of noncapital sentences is virtually nonexistent.").

However, ten years ago a new understanding of cruel and unusual punishment emerged. In *Roper*, the Supreme Court held that a state may not impose the death penalty for a crime committed under the age of eighteen. 543 U.S. at 578, 125 S. Ct. at 1200, 161 L. Ed. 2d at 28. Unquestionably, youth and its attendant characteristics were compelling factors in the Court's analysis. *See id.* at 569–74, 125 S. Ct. at 1195–97, 161 L. Ed. 2d at 21–25. The Court commented on three differences

between youth and adults. *Id.* at 569–70, 125 S. Ct. at 1195, 161 L. Ed. 2d at 21–23. As it had before, the Court explained:

> [A]s any parent knows and as the scientific and sociological studies . . . tend to confirm, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions."

*Id.* at 569, 125 S. Ct. at 1195, 161 L. Ed. 2d at 21 (quoting *Johnson*, 509 U.S. at 367, 113 S. Ct. at 2668–69, 125 L. Ed. 2d at 306). The Court also noted "that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.* at 569, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22. These two factors generally decrease the culpability of juvenile offenders. *See id.* "Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment." *Id.* at 570, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22. "Once the diminished culpability of juveniles is recognized, it is evident that the penological justifications for the death penalty apply to them with lesser force than to adults." *Id.* at 571, 125 S. Ct. at 1196, 161 L. Ed. 2d at 23.

A greater capacity for change and rehabilitation complemented the juvenile's diminished culpability. The Court observed: "[T]he character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id.* at 570, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22. "From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for greater possibility exists that a minor's character deficiencies will be reformed." *Id.* at 570, 125 S. Ct. at 1195–96, 161 L. Ed. 2d at 22. "Indeed, '[t]he relevance of youth as a mitigating factor derives from the

fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.'" *Id.* at 570, 125 S. Ct. at 1196, 161 L. Ed. 2d at 22 (quoting *Johnson,* 509 U.S. at 368, 113 S. Ct. at 2669, 125 L. Ed. 2d at 306). "It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24. Accordingly, the Court held the death penalty could not be imposed for a crime committed under eighteen years of age. *Id.* at 578, 125 S. Ct. at 1200, 161 L. Ed. 2d at 28.

Five years later, the Court made a revolutionary advance for juvenile justice. In *Graham,* a seventeen-year-old probationer was sentenced to life in prison (and had no opportunity for parole because Florida has abolished its parole system, *see* Fla. Stat. § 921.002(1)(*e*) (2003)), for actively participating in a series of armed home invasion robberies. 560 U.S. at 54–55, 57, 130 S. Ct. at 2018–19, 2020, 176 L. Ed. 2d at 832–33, 834–35. The Court again reversed the state court and vacated the sentence. Although there was a national consensus against sentencing juvenile offenders to the death penalty, thirty-seven states and the District of Columbia had statutory schemas permitting a juvenile offender to receive a life-without-parole sentence for a nonhomicide crime. *Id.* at 62, 130 S. Ct. at 2023, 176 L. Ed. 2d at 837. The Court opined, however, that "[a]ctual sentencing practices" revealed it was rare for a juvenile to receive such a sentence. *Id.* at 62, 130 S. Ct. at 2023, 176 L. Ed. 2d at 838. The Court concluded a national consensus had developed against the practice of life-without-parole sentences for juvenile nonhomicide offenders even if a statute remained

on the books in a large number of states. *Id.* at 67, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841.

More importantly, despite what appeared to be a national consensus against giving youthful nonhomicide offenders life-without-parole sentences, the Court proceeded to the second prong of analysis in a categorical challenge. *See id.* at 67–75, 130 S. Ct. at 2026–30, 176 L. Ed. 2d at 841–46. It reiterated the lessons of *Roper* that juveniles generally have decreased culpability, but treated those lessons as "established." *Id.* at 68, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841. After rejecting penological justifications for life-without-parole sentences for juvenile nonhomicide offenders, the Court concluded:

> A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.

*Id.* at 75, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46. This conclusion, of course, expresses a growing understanding of the meaning of cruel and unusual punishment. This understanding has continued to reveal the truth that the protections against cruel and unusual punishment need to account for the unique differences between juvenile and adult behaviors.

Two years later, the Court took an additional stride forward by holding in *Miller* that a statutory scheme that mandated a life-without-parole sentence for juvenile homicide offenders with no opportunity to take the offender's youth into account as a mitigating factor violated the Eighth Amendment. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424. A key component of the Court's reasoning was the recognition that "children are constitutionally different from adults for

purposes of sentencing." *Id.* at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418. It arrived at its conclusion not merely by relying on *Roper* and *Graham* but by weaving together "two strands of precedent"—one involving categorical bans on punishment for certain crimes and offenders and the other requiring sentencing authorities consider particular characteristics of the crime and the criminal before imposing a death sentence. *Id.* at ___, 132 S. Ct. at 2463, 183 L. Ed. 2d at 417–18. Perhaps more importantly, the Court, recognized that "none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific." *Id.* at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 420. The Court added, "By making youth (and all that accompanies it) irrelevant to imposition of [a life-without-parole sentence], such a scheme poses too great a risk of disproportionate punishment." *Id.* at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424. The Court closed, noting:

> Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

*Id.*

Last term, we expanded the reach of the Supreme Court's reasoning in a trilogy of juvenile justice cases decided under the Iowa Constitution. In all three cases, we thoroughly canvassed the Court's precedent and examined the contours of *Roper*, *Graham*, and *Miller*. *See Ragland*, 836 N.W.2d at 114–22; *Pearson*, 836 N.W.2d at 95–97; *Null*, 836 N.W.2d at 60–68. We also held "that the unconstitutional imposition of a mandatory life-without-parole sentence is not fixed by substituting it with a sentence with parole that is the practical equivalent of a life

sentence without parole." *Ragland*, 836 N.W.2d at 121. In *Null*, we held that "[t]he prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation' required to obtain release and reenter society as required by *Graham*." *Null*, 836 N.W.2d at 71 (quoting *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030, 176 L Ed. 2d at 845–46). We recognized there was no meaningful difference between a mandatory life-without-parole sentence—commanding the juvenile to spend the entirety of his life in prison and then die there—and a sentence styled as a mere mandatory term of years that, as a practical matter, would obtain the same result. *See Ragland*, 836 N.W.2d at 121; *Null*, 836 N.W.2d at 71. We reached even further in *Pearson*, however, understanding that two twenty-five year sentences (each subject to a mandatory minimum of seventeen-and-one-half years for a total of thirty-five years) "effectively deprived [the defendant] of any chance of an earlier release and the possibility of leading a more normal adult life." 836 N.W.2d at 96. A concurrence in *Pearson* recognized the case was limited to its bizarre facts and procedural posture, but pointed out that an authentic application of *Miller* and *Null* would correctly apply to all crimes and require a sentencing judge to have the discretion to depart from a mandatory minimum before imposing any minimum sentence. *Id.* at 98–99 (Cady, C.J., concurring specially).

To be sure, death conceivably remained different not only after the Court's opinion in *Roper*, but after the Supreme Court's opinions in *Graham* and *Miller*. After all, *Roper* was a death penalty case and could have been viewed as merely correcting the course after *Stanford*. *Miller* similarly concerned a statute that required a person be incarcerated for the remainder of their life. *Graham* itself recognized that "life without

parole is 'the second most severe penalty permitted by law.' " 560 U.S. at 69, 130 S. Ct. at 2027, 176 L. Ed. 2d at 842 (quoting *Harmelin*, 501 U.S. at 1001, 111 S. Ct. at 2705, 115 L. Ed. 2d at 869 (Kennedy, J., concurring)); *see also* William W. Berry III, *More Different than Life, Less Different than Death*, 71 Ohio St. L.J. 1109, 1123–28 (2010) (arguing *Graham* treats life without parole as another category that, like the death penalty, is irreducibly different than other term-of-years sentences).

Yet, as our recent trilogy of cases illustrate, death has ceased to be different for the purposes of juvenile justice. While *Graham*, like *Roper*, placed a barrier to one punishment for juveniles, we recognized that *Miller* articulated a substantial principle requiring a district court to have discretion to impose a lesser sentence. We realized *Miller* left open a number of possibilities, including whether life without parole could ever be imposed for homicide committed by a juvenile and "to what extent a mandatory minimum sentence for adult crimes can automatically be imposed on a juvenile tried as an adult." *Null*, 836 N.W.2d at 66–67. While emerging neuroscience painted a compelling picture of the juvenile's diminished culpability "in the context of the death penalty and life-without-parole sentences, [we recognized] it also applies, perhaps more so, in the context of lesser penalties as well." *Pearson*, 836 N.W.2d at 98. Our recent procession of cases clearly indicates that death is no longer irreconcilably different under article I, section 17 of the Iowa Constitution, at least for juveniles.

Moreover, death sentences have never truly been the difference maker with respect to treating juveniles as adults. As Professor Guggenheim has pointed out, the Court recognized differences of constitutional magnitude between adults and children in an array of nonpunishment contexts. *See* Guggenheim, 47 Harv. C.R.-C.L. L. Rev. at

474–87.  The Court permitted intrusions upon the constitutional rights of youths that would be starkly impermissible as applied to adults.  *See, e.g., New Jersey v. T.L.O.*, 469 U.S. 325, 341–42, 105 S. Ct. 733, 742–43, 83 L. Ed. 2d 720, 734–35 (1985) (holding a school official may search a child student without a warrant "when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school");[6] *Bellotti v. Baird*, 443 U.S. 622, 643–44, 99 S. Ct. 3035, 3048, 61 L. Ed. 2d 797, 813–14 (1979) (holding a statute requiring judicial supervision of a minor's abortion, which would be unconstitutional as applied to an adult, could be constitutional under some circumstances); *Ginsburg v. New York*, 390 U.S. 629, 641–43, 88 S. Ct. 1274, 1281–82, 20 L. Ed. 2d 195, 204–06 (1968) (holding a state statute prohibiting minors from purchasing pornographic materials was a valid exercise of state power).  As the Court explained in *Ginsburg*, "even where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults.'"  390 U.S. at 638, 88 S. Ct. at 1280, 20 L. Ed. 2d at 203 (quoting *Prince v.*

---

[6]We note that *T.L.O.* is also a "special needs" search case, perhaps more purely than it is a children's rights case.  *See* 469 U.S. at 341–43, 105 S. Ct. at 742–43, 83 L. Ed. 2d at 734–36.  In this regard, *T.L.O.* also prizes the interest of school teachers to maintain order in schools.  *See id.* at 343, 105 S. Ct. at 743, 83 L. Ed. 2d at 735 ("By focusing on the question of reasonableness, the standard will spare teachers and school administrators the necessity of schooling themselves in the niceties of probable cause and permit them to regulate their conduct according to the dictates of reason and common sense.").  Balancing the child's privacy interest—which is not a nullity—against the school's interest in maintaining order, the Court concluded a youthful student may be searched without a warrant when a school official has reasonable suspicion of wrongdoing by the student.  *See id.* at 342–43, 105 S. Ct. at 742–43, 83 L. Ed. 2d at 735–36.  Last term, we were presented with a proffered special need in *Kern*, 831 N.W.2d at 165–72.  We refused to recognize the special needs doctrine, at least for the time being.  *Id.* at 170.  Our mention of *T.L.O.* today expresses no opinion regarding the special needs doctrine or the privacy interest of juveniles.

*Massachusetts*, 321 U.S. 158, 170, 64 S. Ct. 438, 444, 88 L. Ed. 645, 654 (1944)).

The nub of at least some of these cases is that juveniles are not fully equipped to make "important, affirmative choices with potentially serious consequences." *Baird*, 443 U.S. at 635, 99 S. Ct. at 3044, 61 L. Ed. 2d at 808. "[D]uring the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them." *Id.* The Court also said:

> We have recognized three reasons justifying the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing.

*Id.* at 634, 99 S. Ct. at 3043, 61 L. Ed. 2d at 807. This reasoning is ancient, dating back to Blackstone, *see* 1 W. Blackstone, *Commentaries on the Laws of England* *464–65 (George Sharswood ed. 1870) (identifying common law disabilities of children but arguing "their very disabilities are privileges; in order to secure them from hurting themselves by their own improvident acts"), but continues to be forceful today.

More recently, the United States Supreme Court has recognized a child's age is relevant to the analysis of whether the child is in custody for the purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). *See J.D.B.*, 564 U.S. at ___, 131 S. Ct. at 2402–06, 180 L. Ed. 2d at 326–27. The Court there recognized that youth "is a fact that 'generates commonsense conclusions about behavior and perception' " that "apply broadly to children as a class" and are "self-evident to anyone who was a child once." *Id.* at ___, 131 S. Ct. at 2403,

180 L. Ed. 2d at 323 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 674, 124 S. Ct. 2140, 2155, 158 L. Ed. 2d 938, 958 (2004) (Breyer, J., dissenting)). Moreover, a child's impressionability continued to be relevant: the Court noted "that events that 'would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens.'" *Id.* (quoting *Haley v. Ohio*, 332 U.S. 596, 599, 68 S. Ct. 302, 304, 92 L. Ed. 224, 228 (1948)). In short, because children are categorically different under the law, the child's age is "a reality that courts cannot simply ignore." *Id.* at ___, 131 S. Ct. at 2406, 180 L. Ed. 2d at 327.

Upon exercise of our independent judgment, as we are required to do under the constitutional test, we conclude that the sentencing of juveniles according to statutorily required mandatory minimums does not adequately serve the legitimate penological objectives in light of the child's categorically diminished culpability. *See Graham*, 560 U.S. at 71–75, 130 S. Ct. at 2028–30, 176 L. Ed. 2d at 842–45. First and foremost, the time when a seventeen-year-old could seriously be considered to have adult-like culpability has passed. *See Null*, 836 N.W.2d at 70; *see also Bruegger*, 773 N.W.2d at 885 (recognizing that youth applies broadly to diminish culpability). Of course, scientific data and the opinions of medical experts provide a compelling and increasingly ineluctable case that from a neurodevelopment standpoint, juvenile culpability does not rise to the adult-like standard the mandatory minimum provision of section 902.12(5) presupposes. Thus, this prevailing medical consensus continues to inform and influence our opinion today under the constitutional analysis we are required to follow. As demonstrated by our prior opinions and the recent opinions of the United States Supreme Court, however, we can speak of youth in the commonsense terms of what any parent knows or what any former child knows, and so, surely,

we do not abdicate our constitutional duty to exercise independent judgment when we determine Lyle does not have adult-like culpability. *Cf. Hall v. Florida*, 572 U.S. ___, ___, 134 S. Ct. 1986, 2000, ___ L. Ed. 2d ___, ___ (2014) ("It is the Court's duty to interpret the Constitution, but it need not do so in isolation. The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework."). Of course, as we have said before, we do not forget that "while youth is a mitigating factor in sentencing, it is not an excuse." *Null*, 836 N.W.2d at 75. The constitutional analysis is not about excusing juvenile behavior, but imposing punishment in a way that is consistent with our understanding of humanity today.

We understand and appreciate that harm to a victim is not diluted by the age of the offender. *Schall*, 467 U.S. at 264–65, 104 S. Ct. at 2410, 81 L. Ed. 2d at 217. Yet, justice requires us to consider the culpability of the offender in addition to the harm the offender caused. After all, "[i]t is generally agreed 'that punishment should be directly related to the personal culpability of the criminal defendant.'" *Thompson*, 487 U.S. at 834, 108 S. Ct. at 2698, 101 L. Ed. 2d at 717 (quoting *California v. Brown*, 479 U.S. 538, 545, 107 S. Ct. 837, 841, 93 L. Ed. 2d 934, 942 (1987) (O'Connor, J., concurring)). A constitutional framework that focused only on the harm the defendant caused would never have produced *Roper*, which involved a profoundly heinous crime. *See* 543 U.S. at 556–58, 573–74, 125 S. Ct. at 1187–88, 1197, 161 L. Ed. 2d at 13–14, 24–25.

We recognize the prior cases considering whether certain punishments were cruel and unusual all involved harsh, lengthy sentences, including death sentences. *See Miller*, 567 U.S. at ___, 132

S. Ct. at 2469, 183 L. Ed. 2d at 424; *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46; *Roper*, 543 U.S. at 578, 125 S. Ct. at 1200, 161 L. Ed. 2d at 28; *Johnson*, 509 U.S. at 367, 113 S. Ct. at 2668–69, 125 L. Ed. 2d at 305–06; *Thompson*, 487 U.S. at 836–38, 108 S. Ct. at 2699–2700, 101 L. Ed. 2d at 719–20; *Eddings*, 455 U.S. at 115–17, 102 S. Ct. at 877–78, 71 L. Ed. 2d at 11–12; *see also Ragland*, 836 N.W.2d at 121–22; *Pearson*, 836 N.W.2d at 96; *Null*, 836 N.W.2d at 76. Of course, the Supreme Court has recognized that the denial of even the opportunity to apply for parole for a portion or the entirety of the applicable period of incarceration renders the sentence harsher. *See Graham*, 560 U.S. at 70, 130 S. Ct. at 2027, 176 L. Ed. 2d at 842 ("The Court has recognized the severity of sentences that deny convicts the possibility of parole."); *Solem v. Helm*, 463 U.S. 277, 300–01, 103 S. Ct. 3001, 3015, 77 L. Ed. 2d 637, 656 (1983) (distinguishing commutation from parole because, while "[p]arole is a regular part of the rehabilitative process" and a prisoner can normally expect parole "[a]ssuming good behavior," commutation is an "*ad hoc* exercise of executive clemency"); *Rummel v. Estelle*, 445 U.S. 263, 280–81, 100 S. Ct. 1133, 1142–43, 63 L. Ed. 2d 382, 395 (1980) (recognizing the opportunity for parole, "however slim," mollifies the severity of the convict's sentence).

More importantly, the Supreme Court has emphasized that nothing it has said is "crime-specific," suggesting the natural concomitant that what it said is not punishment-specific either. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 420. We recognized as much last term. *See Null*, 836 N.W.2d at 71 ("[T]he notions in *Roper*, *Graham*, and *Miller* that 'children are different' and that they are categorically less culpable than adult offenders *apply as fully in this case as in any other*." (Emphasis added.)); *see also Pearson*, 836 N.W.2d

at 99 (Cady, C.J., concurring specially) (recognizing the gravity of the offense does not affect the applicability of the juvenile's rights under article I, section 17). Simply put, attempting to mete out a given punishment to a juvenile for retributive purposes irrespective of an individualized analysis of the juvenile's categorically diminished culpability is an irrational exercise. *Pearson*, 836 N.W.2d at 98 ("[L]imiting the teachings and protections of these recent cases to only the harshest penalties known to law is as illogical as it is unjust.").

The United States Supreme Court has opined "the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence." *Roper*, 543 U.S. at 571, 125 S. Ct. at 1196, 161 L. Ed. 2d at 23. Punishment simply plays out differently with juveniles. Even in the context of capital punishment, the Court has sagaciously recognized that "[t]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Thompson*, 487 U.S. at 837, 108 S. Ct. at 2700, 101 L. Ed. 2d at 720. We add that a deterrence rationale is actually *even less applicable* when the crime (and concordantly the punishment) is lesser. If a juvenile will not engage in the kind of cost-benefit analysis involving the death penalty that may deter them from committing a crime, there is no reason to believe a comparatively minor sentence of a term of years subject to a mandatory minimum will do so. *See Pearson*, 836 N.W.2d at 98–99. "[A] juvenile's impetuosity can lead them to commit not only serious crimes, but considerably pettier crimes as well." *Id.*

Rehabilitation and incapacitation *can* justify criminally punishing juveniles, but mandatory minimums do not further these objectives in a

way that adequately protects the rights of juveniles within the context of the constitutional protection from the imposition of cruel and unusual punishment for a juvenile. *See Graham*, 560 U.S. at 72, 130 S. Ct. at 2029, 176 L. Ed. 2d at 844 ("Even if the punishment has some connection to a valid penological goal, it must be shown that the punishment is not grossly disproportionate in light of the justification offered."). As much as youthful immaturity has sharpened our understanding to use care in the imposition of punishment of juveniles, it also reveals an equal understanding that reform can come easier for juveniles without the need to impose harsh measures. Sometimes a youthful offender merely needs time to grow. As with the lack of maturity in youth, this too is something most parents know.

The greater likelihood of reform for juveniles also substantially undermines an incapacitation rationale. *See id.* at 72–73, 130 S. Ct. at 2029, 176 L. Ed. 2d at 844–45. The juvenile justice jurisprudence of the United States Supreme Court—like our own—is beginning to regard the incapacitation rationale with a healthy skepticism. *See id.* at 73, 130 S. Ct. at 2029, 176 L. Ed. 2d at 845 ("Incapacitation cannot override all other considerations, lest the Eighth Amendment's rule against disproportionate sentences be a nullity."). A close reading of *Graham* demonstrates the Supreme Court views the incapacitation rationale even more limitedly: the Court recognized Florida needed to incapacitate the youthful offender to the extent he "posed an immediate risk" of "escalating [his] pattern of criminal conduct." *Graham*, 560 U.S. at 73, 130 S. Ct. at 2029, 176 L. Ed. 2d at 844 (internal quotation marks omitted).

Given the juvenile's greater capacity for growth and reform, it is likely a juvenile can rehabilitate faster if given the appropriate

opportunity. "Because 'incorrigibility is inconsistent with youth,' care should be taken to avoid 'an irrevocable judgment about [an offender's] value and place in society.'" *Null*, 836 N.W.2d at 75 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419). After the juvenile's transient impetuosity ebbs and the juvenile matures and reforms, the incapacitation objective can no longer seriously be served, and the statutorily mandated delay of parole becomes "nothing more than the purposeless and needless imposition of pain and suffering." *Coker*, 433 U.S. at 592, 97 S. Ct. at 2866, 53 L. Ed. 2d at 989.

If the undeveloped thought processes of juveniles are not properly considered, the rehabilitative objective can be inhibited by mandatory minimum sentences. After all, mandatory minimum sentences foreswear (though admittedly not altogether) the rehabilitative ideal. Juvenile offenders who are placed in prison at a formative time in their growth and formation, *see Null*, 836 N.W.2d at 55, can be exposed to a life that can increase the likelihood of recidivism. *See* Ioana Tchoukleva, Note, *Children Are Different: Bridging the Gap Between Rhetoric and Reality Post* Miller v. Alabama, 4 Cal. L. Rev. Circuit 92, 104 (Aug. 2013).

In the end, we conclude all mandatory minimum sentences of imprisonment for youthful offenders are unconstitutional under the cruel and unusual punishment clause in article I, section 17 of our constitution. Mandatory minimum sentences for juveniles are simply too punitive for what we know about juveniles. Furthermore, we do not believe this conclusion is inconsistent with the consensus of Iowans. Although most parents fortunately will never find themselves in a position to be in court to see their teenage child sentenced to a mandatory minimum term of imprisonment for committing a forcible felony, we think most parents would be stunned to learn this state had a

sentencing schema for juvenile offenders that required courts to imprison all youthful offenders for conduct that constituted a forcible felony without looking behind the label of the crime into the details of the particular offense and the individual circumstances of the child. Additionally, we think the jolt would be compounded once parents would further discover that their child must serve at least seventy percent of the term of the mandatory sentence before becoming eligible for parole. This shock would only intensify when it is remembered how some serious crimes can at times be committed by conduct that appears less serious when the result of juvenile behavior. This case could be an illustration.

A forcible felony can be the product of inane juvenile schoolyard conduct just as it can be the product of the cold and calculated adult conduct most people typically associate with a forcible felony, such as robbery. Yet, our laws have been shaped over the years to eliminate any distinction. Juveniles over sixteen years of age or older who commit any form of forcible felony are now excluded under our law from the jurisdictional arm of juvenile courts and are prosecuted as adults. Iowa Code § 232.8(1)(*c*). Consequently, the mandatory minimum sentences applicable to adult offenders apply, with no exceptions, to juvenile offenders, including those who engage in inane juvenile schoolyard conduct. At least for those juveniles, our collective sense of humanity preserved in our constitutional prohibition against cruel and unusual punishment and stirred by what we all know about child development demands some assurance that imprisonment is actually appropriate and necessary. There is no other area of the law in which our laws write off children based only on a category of conduct without considering all background facts and circumstances.

Overall, no other logical result can be reached under article I, section 17, a result that is also embedded within the most recent cases from the United States Supreme Court. The Supreme Court banned mandatory life-without-parole sentences for juveniles in *Miller*, but it did not ban nonmandatory life-without-parole sentences if the sentencing court is given the opportunity to consider the attributes of youth in mitigation of punishment. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424; *see also Ragland*, 836 N.W.2d at 121. Thus, juveniles can still be sentenced to long terms of imprisonment, but not mandatorily.[7] Accordingly, the heart of the constitutional infirmity with the punishment imposed in *Miller* was its mandatory imposition, not the length of the sentence. The mandatory nature of the punishment establishes the constitutional violation. Yet, article I, section 17 requires the punishment for all crimes "be graduated and proportioned to [the] offense." *Cf. Weems*, 217 U.S. at 367, 30 S. Ct. at 549, 54 L. Ed. at 798. In other words, the protection of article I, section 17 applies across the board to all crimes. Thus, if mandatory sentencing for the most serious crimes that impose the most serious punishment of life in prison without parole violates article I, section 17, so would mandatory sentences for less serious crimes imposing the less serious punishment of a minimum period of time in prison without parole. All children are protected by the Iowa Constitution. The constitutional prohibition against cruel and unusual punishment does not protect all children if the constitutional

---

[7]Because our holding focuses exclusively on a statutory schema that requires a district court to impose a sentence containing a minimum period of time a juvenile must serve before becoming eligible for parole and that denies a district court the discretion to impose a lesser sentence, we do not consider the situation in which a district court imposes a sentence that denies the juvenile the opportunity for parole in the absence of a statute requiring such a result. Accordingly, we do not determine whether such a sentence would be constitutional.

infirmity identified in mandatory imprisonment for those juveniles who commit the most serious crimes is overlooked in mandatory imprisonment for those juveniles who commit less serious crimes. *Miller* is properly read to support a new sentencing framework that reconsiders mandatory sentencing for all children. Mandatory minimum sentencing results in cruel and unusual punishment due to the differences between children and adults. This rationale applies to all crimes, and no principled basis exists to cabin the protection only for the most serious crimes.

Additionally, the analysis needed to properly apply article I, section 17 to the absence of a sentencing procedure does not bear on the disparity between the crime and the length of the sentence. *Cf. Graham*, 560 U.S. at 60, 130 S. Ct. at 2022, 176 L. Ed. 2d at 836–37. As a categorical challenge, the length of the sentence relative to the crime does not advance the analysis to reach an answer. *See id.* at 61, 130 S. Ct. at 2022, 176 L. Ed 2d at 836–37. Instead, the analysis turns to the procedure to see if it results in disproportionate punishment for youthful offenders. Mandatory sentencing for adults does not result in cruel and unusual punishment but for children it fails to account for too much of what we know is child behavior.

Ultimately, we hold a mandatory minimum sentencing schema, like the one contained in section 902.12, violates article I, section 17 of the Iowa Constitution when applied in cases involving conduct committed by youthful offenders. We agree categorical rules can be imperfect, "but one is necessary here." *Id.* at 75, 130 S. Ct. at 2030, 176 L. Ed. 2d at 846. We must comply with the spirit of *Miller*, *Null*, and *Pearson*, and to do so requires us to conclude their reasoning applies to even a short sentence that deprives the district court of discretion in

crafting a punishment that serves the best interests of the child and of society.[8] The keystone of our reasoning is that youth and its attendant circumstances and attributes make a broad statutory declaration denying courts this very discretion categorically repugnant to article I, section 17 of our constitution.[9]

---

[8]We do not ignore the legislature's passage of a statute vesting considerable discretion in district courts to depart from any part of a sentence, including any mandatory minimum. Iowa Code Ann. § 901.5(14) (West, Westlaw current through 2014 Reg. Sess.). However, the mere theoretical availability of unguided sentencing discretion, no matter how explicitly codified, is not a panacea. As we said in *Null*, *Miller* requires "more than a generalized notion of taking age into consideration as a factor in sentencing." *Null*, 836 N.W.2d at 74. *Null* provides a district court must expressly recognize certain concepts and "should make findings why the general rule [that children are constitutionally different from adults] does not apply." *Id.* In *Ragland*, we noted the sentencing court "*must consider*" several factors at the sentencing hearing, including:

> (1) the "chronological age" of the youth and the features of youth, including "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the "family and home environment" that surrounded the youth; (3) "the circumstances of the . . . offense, including the extent of [the youth's] participation in the conduct and the way familial and peer pressures may have affected [the youth]"; (4) the "incompetencies associated with youth—for example, [the youth's] inability to deal with police officers or prosecutors (including on a plea agreement) or [the youth's] incapacity to assist [the youth's] own attorneys"; and (5) "the possibility of rehabilitation."

836 N.W.2d at 115 n.6 (emphasis added) (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423). Clearly, these are all *mitigating factors*, and they cannot be used to justify a harsher sentence. *See id.* at 115 & n.6; *see also Null*, 836 N.W.2d at 74–75. In *Pearson*, for instance, we found the district court's consideration of youth as an aggravating factor in favor a harsher sentence to be error. 836 N.W.2d at 97.

[9]We recognize we have held a mandatory minimum sentence constitutional. *See State v. Lara*, 580 N.W.2d 783, 785 (Iowa 1998); *State v. Horn*, 282 N.W.2d 717, 732 (Iowa 1979); *State v. Holmes*, 276 N.W.2d 823, 829 (Iowa 1979); *State v. Fitz*, 265 N.W.2d 896, 899 (Iowa 1978); *State v. Hall*, 227 N.W.2d 192, 194–95 (Iowa 1975); *see also State v. Fuhrmann*, 261 N.W.2d 475, 479–80 (Iowa 1978) (holding mandatory life imprisonment for first-degree murder was constitutional). None of these cases involved challenges brought under article I, section 17 of our constitution, nor did any of these cases involve challenges brought by youthful offenders. Furthermore, given that the most recent of these cases is sixteen years old and antedates *Roper* by seven years, we do not find them persuasive on the outcome of our decision. We thus express no opinion regarding the continuing vitality of these cases.

It is important to be mindful that the holding in this case does not prohibit judges from sentencing juveniles to prison for the length of time identified by the legislature for the crime committed, nor does it prohibit the legislature from imposing a minimum time that youthful offenders must serve in prison before being eligible for parole. Article I, section 17 only prohibits the one-size-fits-all mandatory sentencing for juveniles. Our constitution demands that we do better for youthful offenders—all youthful offenders, not just those who commit the most serious crimes. Some juveniles will deserve mandatory minimum imprisonment, but others may not. A statute that sends all juvenile offenders to prison for a minimum period of time under all circumstances simply cannot satisfy the standards of decency and fairness embedded in article I, section 17 of the Iowa Constitution.

We also recognize the remedy in this case is to resentence Lyle so a judge can at least consider a sentencing option other than mandatory minimum imprisonment. We also recognize our decision will apply to all juveniles currently serving a mandatory minimum sentence of imprisonment. Thus, this case will require all juvenile offenders who are in prison under a mandatory minimum sentence to be returned to court for resentencing. This process will likely impose administrative and other burdens, but burdens our legal system is required to assume. Individual rights are not just recognized when convenient. Our court history has been one that stands up to preserve and protect individual rights regardless of the consequences. The burden now imposed on our district judges to preserve and protect the prohibition against cruel and unusual punishment is part of the price paid by many judges over the years that, in many ways, has helped write the proud history Iowans enjoy today. Even if the resentencing does not alter the sentence for

most juveniles, or any juvenile, the action taken by our district judges in each case will honor the decency and humanity embedded within article I, section 17 of the Iowa Constitution and, in turn, within every Iowan. The youth of this state will be better served when judges have been permitted to carefully consider all of the circumstances of each case to craft an appropriate sentence and give each juvenile the individual sentencing attention they deserve and our constitution demands. The State will be better served as well.

Furthermore, our holding today has no application to sentencing laws affecting adult offenders. Lines are drawn in our law by necessity and are incorporated into the jurisprudence we have developed to usher the Iowa Constitution through time. This case does not move any of the lines that currently exist in the sentencing of adult offenders.

On remand, judges will do what they have taken an oath to do. They will apply the law fairly and impartially, without fear. They will sentence those juvenile offenders to the maximum sentence if warranted and to a lesser sentence providing for parole if warranted.[10]

---

[10]To avoid any uncertainty about the parameters of the resentencing hearing and the role of the district court on resentencing, we reiterate that the specific constitutional challenge raised on appeal and addressed in this opinion concerns the statatory imposition of a minimum period of incarceration without parole equal to seventy percent of the mandatory sentence. The holding in this case does not address the mandatory sentence of incarceration imposed under the statutory sentencing schema or any other issues relating to the sentencing schema. Under article I, section 17 of the Iowa Constitution, the portion of the statutory sentencing schema requiring a juvenile to serve seventy percent of the period of incarceration before parole eligibility may not be imposed without a prior determination by the district court that the minimum period of incarceration without parole is warranted under the factors identified in *Miller* and further explained in *Null.* The factors to be used by the district court to make this determination on resentencing include: (1) the age of the offender and the features of youthful behavior, such as "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the particular "family and home environment" that surround the youth; (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime; (4) the challenges for youthful offenders in navigating through the criminal process; and (5) the possibility of rehabilitation and the capacity for change. *See Miller,*

Accordingly, article I, section 17 of the Iowa Constitution forbids a mandatory minimum sentencing schema for juvenile offenders that deprives the district court of the discretion to consider youth and its attendant circumstances as a mitigating factor and to impose a lighter punishment by eliminating the minimum period of incarceration without parole.

**V. Conclusion.**

For the above reasons, we vacate Lyle's sentence and remand the case to the district court for further proceedings.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT SENTENCE VACATED; CASE REMANDED.**

All justices concur except Waterman, Mansfield, and Zager, JJ. Waterman and Zager, JJ., write separate dissents. Waterman, J., joins Zager, J., and Mansfield, J., joins both Waterman, J., and Zager, J.

---

567 U.S. at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 424; *Null,* 836 N.W.2d at 74–75; *see also Pearson*, 836 N.W.2d at 95–96; *Ragland*, 836 N.W.2d at 115 n.6.

In order to address the issue raised in this appeal, the district court shall conduct a hearing in the presence of the defendant and decide, after considering all the relevant factors and facts of the case, whether or not the seventy percent mandatory minimum period of incarceration without parole is warranted as a term of sentencing in the case. If the mandatory minimum sentence is not warranted, the district court shall resentence the defendant by imposing a condition that the defendant be eligible for parole. If the mandatory minimum period of incarceration is warranted, the district court shall impose the sentence provided for under the statute, as previously imposed.

**WATERMAN**, **Justice (dissenting).**

I respectfully dissent for the reasons set forth in Justice Zager's dissent, which I join. I write separately because I would go further to overrule as plainly erroneous our court's juvenile sentencing decisions in *Pearson* and *Null* for the reasons explained in the dissents in those cases. *See State v. Pearson*, 836 N.W.2d 88, 99–107 (Iowa 2013) (Mansfield, J., dissenting); *State v. Null*, 836 N.W.2d 41, 77–84 (Iowa 2013) (Mansfield, J., concurring in part and dissenting in part). And, I would follow Eighth Amendment decisions of our nation's highest court when applying the cruel-and-unusual-punishment provision of the Iowa Constitution because our state's founders intended those provisions to have the same meaning. *See State v. Bruegger*, 773 N.W.2d 862, 882 (Iowa 2009) ("Article I, section 17 of the Iowa Constitution prohibits cruel and unusual punishment in language materially identical to its federal counterpart. Our past cases have generally assumed that the standards for assessing whether a sentence amounts to cruel and unusual punishment under the Iowa Constitution are identical to the Federal Constitution."); *see also State v. Short*, ___ N.W.2d ___, ___ (Iowa 2014) (Waterman, J., dissenting) (advocating for a return to our court's long-standing practice of following federal precedent when construing the same language in the Iowa Constitution).

The trial judge found Lyle, then nearly age eighteen, "poses a serious danger to the community at present." In denying Lyle's motion for transfer to juvenile court, the trial judge noted Lyle's "cell phone contained numerous videos which showed [him] engaging in unprovoked, cowardly and vicious attacks against several different individuals" on or near school property. The trial judge personally observed Lyle's defiant

demeanor in open court. I have no reason to disagree with the trial judge's firsthand assessment of Lyle. But, even if we accept Lyle as a merely misguided, immature schoolyard bully, the mandatory sentence he received falls well short of being unconstitutionally cruel and unusual punishment. More importantly, the majority's sweeping, unprecedented holding today precludes mandatory minimum sentences for *any* violent felon who was under age eighteen at the time of the offense.

By holding Lyle's seven-year mandatory minimum sentence for his violent felony is cruel and unusual punishment and unconstitutional under article I, section 17 of the Iowa Constitution, rather than under the Eighth Amendment, the majority evades review by the United States Supreme Court. As Justice Zager observes, no other appellate court in the country has gone this far. Our court stands alone in taking away the power of our elected legislators to require even a seven-year mandatory sentence for a violent felony committed by a seventeen-year-old.

Will the majority stop here? Under the majority's reasoning, if the teen brain is still evolving, what about nineteen-year olds? If the brain is still maturing into the mid-20s, why not prohibit mandatory minimum sentences for any offender under age 26? As judges, we do not have a monopoly on wisdom. Our legislators raise teenagers too. Courts traditionally give broad deference to legislative sentencing policy judgments. *See State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012) ("We give the legislature deference because '[l]egislative judgments are generally regarded as the most reliable objective indicators of community standards for purposes of determining whether a punishment is cruel and unusual.' " (quoting *Bruegger*, 773 N.W.2d at 873)). Why not defer today?

Our trial judges have day-to-day experience adjudicating thousands of juvenile cases. Why not continue to trust the trial judges to make the right individualized judgments in deciding whether a youthful offender should be adjudicated in juvenile court or adult court?[11] Why make today's categorical decision invalidating any mandatory minimum sentence for juveniles when no other appellate court has gone that far? We are not writing on a clean slate. Courts across the country are appropriately concluding that only mandatory life without parole or its de facto equivalent constitute cruel and unusual punishment for juveniles who commit violent felonies. *See People v. Pacheco*, 991 N.E.2d 896, 907 (Ill. App. Ct. 2013) (reading state "proportionate penalties clause" as "coextensive with the eighth amendment" and holding automatic transfer to adult court did not violate State or Federal Constitution; upholding twenty-year mandatory minimum sentence); *State v. Vang*, ___N.W.2d ___, ___, 2014 WL 1805320, at *9–10 (Minn. May 7, 2014) (holding thirty-year sentence does not violate State or Federal Constitution); *see also State v. Lyle*, ___ N.W.2d ___, ___ (Iowa 2014) (Zager, J., dissenting) (collecting additional cases). None have followed *Null* or *Pearson* to extend constitutional prohibitions to shorter sentences.

---

[11]The trial judge, applying the factors in Iowa Code section 232.45(7) (2011), denied Lyle's motion to transfer jurisdiction to juvenile court. The court reviewed Lyle's criminal history and juvenile court services dating back to age thirteen. The court found

> [Lyle] has obviously not benefited from any of the juvenile court services provided to date. He has chosen to remain involved with drugs and a gang, and has instigated numerous violent attacks on unsuspecting victims. His demeanor during the reverse waiver hearing demonstrated his complete disdain for the court system and his lack of interest in any remedial program.

This is much more than an interesting intellectual debate over jurisprudential philosophies and the proper role for independent state constitutional adjudication. Today's decision will have dramatic real-world consequences. Justice Zager has identified the burdens imposed on the judicial system by the scores of resentencing hearings and has noted the trauma to victims who must testify and relive what the defendant did to them. These hearings will reopen the wounds of the victims and their families. And, some of the offenders will gain release from prison earlier than under the mandatory minimum sentences. Some of those violent felons will commit new crimes. I would instead trust the legislative judgment of our elected branches that required a seven-year mandatory minimum prison term for second-degree robbery, a class "C" felony.[12] A seventeen-year-old offender would still be eligible for release by age twenty-five. But, that offender would be incarcerated during the late teens and early twenties—the ages when violent crimes are most likely to be committed. *See* Jeffery T. Ulmer & Darrell Steffensmeier, *The Age and Crime Relationship: Social Variation, Social*

---

[12]Two years after Lyle's conviction, the legislature prospectively granted sentencing courts discretion to waive mandatory minimums if the defendant was under age eighteen at the time he committed the crime. *See* 2013 Iowa Acts ch. 42, § 14 (codified at Iowa Code Ann. § 901.5(14) (West, Westlaw current through 2014 Reg. Sess.)). Significantly, however, the legislature chose not to make this amendment retroactive. *See* Iowa Code § 4.5 (2013) ("A statute is presumed to be prospective in its operation unless expressly made retrospective."). The majority notes only two other states that have limited or abolished mandatory minimum sentences for juveniles. That presumably means forty-seven states continue to allow mandatory minimum sentences for juvenile felons. It certainly is a reasonable policy choice for our legislature in 2013 to grant trial courts discretion in place of mandatory minimums sentences for juvenile felons. But, today's decision precludes future legislatures from returning to the former, reasonable policy choice of requiring a minimum prison term for certain violent felonies. What if there is a wave of violent crimes committed by gang members under age eighteen? I would not take the mandatory minimum sentencing option away from the elected branches by holding any mandatory minimum sentence is cruel and unusual punishment under our state constitution. We do not need to go that far and should not do so.

*Explanations, in The Nurture Versus Biosocial Debate in Criminology* 377, 377–78 (Kevin M. Beaver, Brian B. Boutwell & J.C. Barnes eds., 2014).

The majority opines that the resentencing hearings to be required of our district court judges "will honor the decency and humanity embedded within article I, section 17 of the Iowa Constitution and, in turn, within every Iowan." I believe our elected representatives—not the members of this court—are best equipped to decide what values are embedded within every Iowan.

I do not wish to take issue today with the court's earlier decision in *Bruegger.* However, it is worth repeating the dissenter's apt observation from that case:

> While some constitutional principles might be receptive to defendant's plight, the Cruel and Unusual Punishment Clause is not among them. Courts must adhere to the constitutional framework, even when the result is difficult to swallow. Furthermore, we must not forget that we are not the only guardians of justice in our government. For example, prosecutors must use sound judgment in charging and prosecuting defendants who may be swept up by broad legislative policies that were not likely intended to capture them. The governor, too, is empowered to commute a sentence viewed to be unjust. Finally, consistent with the one true strength of our democracy, the legislature can repair mistakes.

*Bruegger,* 773 N.W.2d at 888 (Cady, J., dissenting). As the *Bruegger* dissent reminds us, we are not the only repositories of fairness. It is certainly possible to "rely upon the other components of government to mete out justice." *Id.*

It is easy in the abstract to say we do not put constitutional rights to a vote. It is the role of the courts to say where constitutional lines are drawn. But, we must remember rights, by definition, are restrictions on governmental power—the government elected by the people. If our court misinterprets a statute, the legislature can amend the statute the next

session. But, if we misinterpret our state constitution, the people are stuck with the decision unless the decision is overruled or the constitution is amended. That is why judges must be extraordinarily careful with constitutional interpretation. Adherence to settled Federal Eighth Amendment precedent would avoid today's aberrational judicial decision-making on sentencing policy.[13]

I therefore dissent for the reasons set forth above and in Justice Zager's dissent.

Mansfield, J., joins this dissent.

---

[13]The amendment process is a check on judicial power. Indeed, the people of Florida amended that state's constitution to require conformity with Supreme Court interpretations of the Eighth Amendment. *See* Fla. Const. art. I, § 17 ("The prohibition . . . against cruel and unusual punishment[] shall be construed in conformity with decisions of the United States Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution.").

**ZAGER, Justice (dissenting).**

I respectfully dissent. I do not believe a seven-year mandatory minimum sentence imposed on an individual who was a juvenile at the time the offense was committed is cruel and unusual punishment under either the Federal or our Iowa Constitution. This mandatory minimum sentence is not grossly disproportional, and there is no recognized categorical challenge for a juvenile's "categorically diminished culpability." There is no authority for holding such. By holding all mandatory minimum sentences imposed on juveniles constitutes cruel and unusual punishment, the majority abandons any semblance of our previous constitutional analysis of cruel and unusual punishment and creates a new category for the sentencing of juveniles to achieve a perceived "best practice" in sentencing. The majority expands article I, section 17 of the Iowa Constitution to a point supported by neither our own caselaw nor by any caselaw of the United States Supreme Court. Neither does such an expansive interpretation find support in the caselaw of any other appellate court in the nation. Contrary to the majority's reasoning, the United States Supreme Court's interpretation of the Federal Constitution does not support this expansive interpretation. I would apply the reasoning of *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), *State v. Null*, 836 N.W.2d 41 (Iowa 2013), and *State v. Pearson*, 836 N.W.2d 88 (Iowa 2013), to the facts of this case and hold this mandatory minimum sentence is not cruel or unusual under the Iowa Constitution.

In both *Pearson* and *Null*, we reversed the mandatory minimum sentences imposed on those juvenile offenders based on an application of the "principles in *Miller* as developed by the Supreme Court in its Eighth

Amendment jurisprudence." *Pearson*, 836 N.W.2d at 96; *see Null*, 836 N.W.2d at 70 (stating "we are persuaded that *Miller*'s principles are sound and should be applied in this case"). The majority here dramatically departs from the analysis we applied in both those cases. Instead, the majority applies the two-prong test applied by the Supreme Court in *Graham v. Florida* to justify its radical departure from our own precedents. *See* 560 U.S. 48, 61, 130 S. Ct. 2011, 2022, 176 L. Ed. 2d 825, 837 (2010) (explaining the approach applied in "cases adopting categorical rules"). One must ask, if the majority felt that all mandatory minimum sentences for juveniles should be considered under this new categorical analysis, why was it not applied in *Null* and *Pearson*? Likely because it did not fit then, and it does not fit now.

It must first be recognized that Lyle did not urge this approach in his appeal. Indeed, in his supplemental brief he "ask[ed] this court to vacate his sentence and remand to the district court for resentencing with consideration given to his youth, immaturity, and chance for rehabilitation, as discussed in *Miller*, *Null*, and *Pearson*." As explained more fully below, *Miller*, *Null*, and *Pearson* rested on a legal concept completely different from *Graham*. The *Graham* Court found the issue to be decided on appeal was whether the Eighth Amendment permitted a juvenile offender to be sentenced to life imprisonment without the possibility for parole for a nonhomicide crime. *See id.* at 52–53, 130 S. Ct. at 2017–18, 176 L. Ed. 2d. at 832. The Court's categorical ban was only on life without the possibility of parole in nonhomicide cases. *See id.* at 82, 130 S. Ct. at 2034, 176 L. Ed. 2d at 850 ("The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide."). Interestingly, the Court in *Miller* only began its analysis of *Graham*'s two-prong test after it had

already expressly held mandatory life-without-parole sentences for juveniles were unconstitutional. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2470, 183 L. Ed. 2d at 424. While *Null* alludes to the two-prong test in discussing *Graham, see Null*, 836 N.W.2d at 62–63, *Pearson* did not mention the two-prong test utilized in *Graham* at all. Nevertheless, the majority bypasses our caselaw from less than a year ago, attempts to apply the *Graham* analysis, and strikes down all mandatory minimum sentences for juveniles.

The majority's reason for applying *Graham* is that juveniles are categorically less culpable, and so a categorical analysis and categorical rules are appropriate here. On its own, the majority now creates a new constitutional category under our Iowa Constitution, but we need to be clear that there is no judicial authority for creating this new constitutional category. Up to this point, in most cases, the fact of a juvenile's diminished culpability only required the sentencing court "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424. Were a categorical rule appropriate based solely on a juvenile's diminished culpability, the Supreme Court in *Miller* would have imposed a categorical rule. Instead, it expressly declined to consider the "argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger." *Id.* at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424. Nevertheless, the majority in this case deems the juvenile's diminished culpability alone is of sufficient constitutional magnitude to impose a categorical rule against mandatory minimum sentences and holds the sentence cruel and unusual.

Though the majority attempts to justify its divergence in its analysis of cruel and unusual punishment, there is a substantial difference between *Graham*'s categorical approach and the approach applied in *Miller*, *Null*, and *Pearson*. In fact, the Court in *Miller* labored to make clear its decision did "not categorically bar a penalty for a class of offenders or type of crime—as, for example, [it] did in *Roper* [*v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)], or *Graham*." *See id.* at ___, 132 S. Ct. at 2471, 183 L. Ed. 2d at 426. The decision "mandate[d] only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Id.* The Court further noted its decision retained the distinction between homicide and nonhomicide offenses: "*Graham* established one rule (a flat ban) for nonhomicide offenses, while we set out a different one (individualized sentencing) for homicide offenses." *Id.* at ___ n.6, 132 S. Ct. at 2466 n.6, 183 L. Ed. 2d at 420 n.6. In extending *Miller*'s rule to the shorter terms of imprisonment in *Pearson* and *Null*, we heeded the Supreme Court's words, retaining the distinction between *Graham* and *Miller*. Now, the majority does what we did not do in *Pearson* and *Null* and what the Supreme Court did not do in *Miller*. The majority flatly bans a "penalty for a class of offenders." *See id.* at ___, 132 S. Ct. at 2471, 183 L. Ed. 2d at 426. So much for the spirit of *Miller*, *Pearson*, and *Null*.

Without success, the majority starts its analysis by attempting to apply the first prong of the two-prong test in *Graham*. In searching for " 'objective indicia of society's standards,' " *Graham*, 560 U.S. at 61, 130 S. Ct. at 2022, 176 L. Ed. 2d at 837 (quoting *Roper*, 543 U.S. at 563, 125 S. Ct. at 1191, 161 L. Ed. 2d at 17), the majority first turns to other states' juvenile sentencing jurisprudence. That search for authority

striking down all mandatory minimum sentences imposed on juveniles, as the majority acknowledges, turns up no support for invalidating all juvenile mandatory minimum sentences. In fact, no other state court has held its state constitution, nor has any federal court held the Federal Constitution, forbids imposing mandatory minimum sentences on juveniles. In fact all authority, except in the life-without-parole context, is to the contrary. *See, e.g.*, *Hobbs v. Turner*, ___ S.W.3d ___, ___, 2014 WL 257378, at *9–11 (Ark. 2014) (upholding a term of imprisonment of fifty-five years for crimes committed at seventeen years of age as not prohibited by the Eighth Amendment or *Miller* and *Graham*); *People v. Perez*, 154 Cal. Rptr. 3d 114, 120–21 (Ct. App. 2013) (concluding that imposing a mandatory sentence on a juvenile that allowed for parole eligibility at age forty-seven was not severe enough to implicate *Miller* or *Graham*); *James v. United States*, 59 A.3d 1233, 1238 (D.C. 2013) (upholding a thirty-year mandatory minimum sentence imposed on a juvenile homicide offender); *People v. Pacheco*, 991 N.E.2d 896, 906–07 (Ill. App. Ct. 2013) (upholding under the Federal and Illinois Constitutions, a twenty-year mandatory minimum sentence imposed on a juvenile); *Diatchenko v. Dist. Att'y*, 1 N.E.3d 270, 285, 286 (Mass. 2013) (striking down life-without-parole sentence imposed on juvenile homicide offender but upholding fifteen-year mandatory minimum); *State v. Vang*, ___ N.W.2d ___, ___, 2014 WL 1805320, at *8–9 (Minn. 2014) (holding mandatory life sentence with possibility of parole after thirty years for first-degree felony murder committed when defendant was fourteen years old did not violate either the Eighth Amendment or the Minnesota Constitution's prohibition against cruel and unusual punishment); *People v. Aponte*, 981 N.Y.S.2d 902, 905–06 (Sup. Ct. 2013) (concluding a life sentence with mandatory minimum of twenty-five years for conviction

of second-degree murder committed by a seventeen year old was not cruel and unusual under *Miller* or *Graham*, or under any Eighth Amendment theory); *see also United States v. Reingold*, 731 F.3d 204, 214 (2d Cir. 2013) ("Nothing in *Graham* or *Miller* suggests that a five-year prison term is the sort of inherently harsh sentence that—like the death penalty or its deferred equivalent, life imprisonment without parole— requires categorical rules to ensure constitutional proportionality . . . ."). To be clear, the majority cannot cite to any case of any court that used the *Graham–Miller* line of jurisprudence to strike down as cruel and unusual punishment any sentence imposed on anyone under the age of eighteen when the individual still had a substantial life expectancy left at the time of eligibility for parole.

Finding no support in a national survey on mandatory minimum sentences for juveniles, apart from legislation limiting the use of mandatory sentences to certain circumstances, the majority elects to give little weight to the strong national consensus approving juvenile mandatory minimum sentences. *But see State v. Bousman*, 278 N.W.2d 15, 18 (Iowa 1979) (concluding in a challenge to a sentence's claimed disproportionality that "[d]eference" is "appropriate" to the "collective judgment" of "a substantial number of states" that "have determined that the punishment rendered here is not grossly out of proportion to the severity of the crime"). Instead, the majority turns to this state's body of unrelated statutory law concerning juveniles. The majority notes that the legislature recently passed a statute granting sentencing judges the discretion to impose shorter terms of imprisonment for juveniles. *See* 2013 Iowa Acts ch. 42, § 14 (codified at Iowa Code Ann. § 901.5(14) (West, Westlaw current through 2014 Reg. Sess.)). According to the majority, we owe deference to this legislative judgment because it is a

reliable indicator of current community standards. *See State v. Bruegger*, 773 N.W.2d 862, 873 (Iowa 2009) ("Legislative judgments are generally regarded as the most reliable objective indicators of community standards for purposes of determining whether a punishment is cruel and unusual."). But, we should not forget, "a reviewing court is not authorized to generally blue pencil criminal sentences to advance judicial perceptions of fairness." *Id.*

It is true we owe deference to the legislature's judgments concerning the sentences imposed for commission of various crimes. *See State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012) ("[W]e owe substantial deference to the penalties the legislature has established for various crimes."); *see also Graham*, 560 U.S. at 71, 130 S. Ct. at 2028, 176 L. Ed. 2d at 843 ("Criminal punishment can have different goals, and choosing among them is within a legislature's discretion."); *Solem v. Helm*, 463 U.S. 277, 290, 103 S. Ct. 3001, 3009, 77 L. Ed. 2d 637, 649 (1983) ("Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes . . . ."). But, if this court is to give deference to legislative judgments concerning punishment enacted after an offender is sentenced, then surely this court must also give deference to legislative judgments that were in effect when the offender was sentenced. The statute in effect at that time of sentencing is at least as good an objective indicium of society's standards as a statute enacted two years later.[14]

---

[14]The majority seems to take the enactment of the new statute as an implicit concession by the legislature that the previous sentencing scheme was unconstitutional. I disagree. In *Bousman*, an offender, Bousman, received a one-year sentence for resisting execution of process. 278 N.W.2d at 15–16. Two days before Bousman's trial began, the new criminal code became effective. *See id.* at 16. The new criminal code provided a maximum punishment of thirty days in jail for the offense of

The statute in effect when Lyle was sentenced mandated he serve seventy percent of his ten-year sentence. *See* Iowa Code § 902.12(5) (2011). Assuming both the new sentencing statute and the older sentencing statute should be considered as indicators of society's standards, they are entitled to equal amounts of deference. Nonetheless, the majority analysis discounts one legislative judgment, because they apparently don't agree with it, by elevating the other with which they do agree. This is not the role of an appellate court.

Having decided substantial deference is owed to a statute not in effect when Lyle was sentenced, the majority identifies other statutes that likewise grant courts discretion when dealing with juveniles. In addition to citing various civil statutes concerning juveniles, the majority cites numerous provisions from the juvenile justice chapter of the Iowa Code that grant courts discretion to consider the best interests of the child when making decisions. *See, e.g.,* Iowa Code § 232.10(2)(*a*) (allowing transfer of delinquency proceedings when transfer would serve, among other interests, "the best interests of the child"); *id.* § 232.62(2)(*a*) (permitting a court to transfer child-in-need-of-assistance proceeding

which Bousman was convicted. *See id.* Based on this disparity, Bousman argued the one-year sentence he received was cruel and unusual. *See id.* at 17.

We rejected Bousman's argument, finding that the change in the length of the sentence did not reflect a legislative judgment about the harshness of the previous sentencing scheme. *See id.* at 17–18. Though "the subsequent action of the Iowa Legislature in decreasing the penalty" was "relevant," we found "its weight [was] considerably decreased by the fact that that same legislature provided" district courts the authority "to select the prior, more severe, punishment." *Id.* at 17. Like the Code section at issue in *Bousman*, the newly enacted juvenile sentencing statute does not preclude the sentencing judge from selecting a similarly severe punishment. *See* 2013 Iowa Acts ch. 42, § 14 (providing "the court *may* suspend the sentence, in whole or in part, including any mandatory minimum sentence" (emphasis added)). Thus, as we did in *Bousman*, we can safely conclude here the new sentencing statute "demonstrates that the legislature did not necessarily reject prior penalties as excessively harsh." *Bousman*, 278 N.W.2d at 17.

when transfer would serve "the best interests of the child"). According to the majority, these statutes reflect the legislature's recognition that juveniles and adults are different. Giving effect to these differences requires that courts have discretion when dealing with juveniles.

I think the majority makes too much of the legislature's grant of discretion to juvenile courts in these other, noncriminal contexts. The legislature's grant of discretion in *some* contexts may well reflect our society's judgment that juveniles are different for purposes of these contexts. It does not follow, however, that juveniles must be treated differently in *all* contexts. Surely the legislature's discretion to select among different penal sanctions contemplates the authority to narrow or expand judicial discretion across varying juvenile contexts. The prerogative for making such policy decisions typically belongs to "our legislature, as representatives of the people." *See Bruegger*, 773 N.W.2d at 887 (Cady, J., dissenting). The legislature, having made a policy distinction it is entitled to make, limits this court's authority to alter it. "Courts do not intervene to alter [sentencing] policies except when the resulting legislative scheme runs contrary to constitutional mandates." *Id.* Nothing in the majority's survey of the objective indicia of our society's standards suggests our society believes violent juvenile offenders are constitutionally different for purposes of sentencing, except for life without parole and its functional equivalent. Thus, this court should not interfere with the legislature's selected sentencing scheme.

Of course this newly conferred sentencing discretion for juveniles, as provided for by the new statute, holds the prospect of being illusory. That is, the majority purports to favor a sentencing scheme in which district courts are able to craft appropriate sentences according to the unique circumstances of each juvenile. In reality, the majority's

approach bestows upon our appellate courts the freedom to impose their members' judgments about the appropriateness of a sentence. After all, sentences are subject to review for abuse of discretion. *See State v. Loyd*, 530 N.W.2d 708, 711 (Iowa 1995). I have serious concerns that in future juvenile sentencing cases appellate courts are likely to remember "our task on appeal is not to second guess the decision made by the district court, but to determine if it was unreasonable or based on untenable grounds." *See State v. Formaro*, 638 N.W.2d 720, 725 (Iowa 2002) (explaining the role of appellate courts in reviewing a district court's sentencing decision).

But, it is in the application of the second prong of the *Graham* test that the majority most clearly departs from our previous cruel and unusual analysis and our precedent. Though in *Pearson* and *Null* we no doubt had the authority to independently interpret our own constitution, nothing we said in those two cases indicated that independence was the foundation of our analysis. Rather, we relied on and expanded on *Miller*'s principles in invalidating the two juvenile sentences. *See Pearson*, 836 N.W.2d at 96 ("Though *Miller* involved sentences of life without parole for juvenile homicide offenders, its reasoning applies equally to Pearson's sentence of thirty-five years without the possibility of parole for these offenses."); *Null*, 836 N.W.2d at 72 (concluding that "*Miller*'s principles are fully applicable to a lengthy term-of-years sentence"). I believe we should adhere to our precedents developed just one year ago in *Pearson* and *Null*. As will be explained below, if the majority was true to the principles espoused in *Pearson*, *Null* and *Miller*, it must hold Lyle's sentence does not violate the cruel and unusual punishment clause of the Iowa Constitution.

In rejecting the mandatory sentences in *Pearson* and *Null*, we applied the principles espoused by the United States Supreme Court in *Miller*. *Pearson*, 836 N.W.2d at 96 (requiring *Miller*'s individualized hearing); *Null*, 836 N.W.2d at 72 ("We conclude that *Miller*'s principles are fully applicable to a lengthy term-of-years sentence as was imposed in this case . . . ."). The Court's holding in *Miller* depended on a convergence of three factors: the offender's age, the harsh sentence, and the mandatory sentencing scheme. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2460, 183 L. Ed. 2d at 414 (describing the facts of the case). This convergence created the risk of a disproportionate sentence. *See id.* at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424 (holding unconstitutional sentencing schemes that impose mandatory life-without-parole sentences on juvenile homicide offenders). To mitigate the risk that disproportionate sentences will be imposed on juveniles convicted of homicide, the Court declared sentencing courts must hold an individualized hearing before imposing a harsh, mandatory life-without-parole sentence on a juvenile, a procedure similar to one that courts must perform before imposing the death penalty. *See id.* at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 422 (explaining that the death penalty may not be imposed without an individualized hearing and concluding "a similar rule should apply when a juvenile confronts a sentence of life (and death) in prison"). Reaching this outcome, however, required the Court in *Miller* to connect the three converging factors to death-penalty sentencing.

The Court began by explaining the differences between children and adults as established in its precedents. *Id.* at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418. First, juveniles are immature and their sense of responsibility is underdeveloped, which leads to "recklessness,

impulsivity, and heedless risk-taking." *Id.* Juveniles are also more vulnerable than adults to negative influences and pressures, less able to control their environment, and unable to escape "horrific, crime-producing settings." *Id.* A juvenile's "character is not as well formed," his traits "less fixed," and "his actions less likely be evidence of irretrievabl[e] deprav[ity]." *Id* at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418 (internal quotation marks omitted).

Psychological research confirmed differences in the brains of adults and children. *See id.* at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 419. Those differences contribute to juveniles' "transient rashness, proclivity for risk, and inability to assess consequences." *See id.* at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419. These developmental deficiencies, the Court reasoned, diminished the juvenile's culpability and "enhanced the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed." *Id.* (internal quotation marks omitted).

Juveniles' attributes undermine the four "penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id.* First, juveniles are less blameworthy than adults, so the case for retribution is weak. *Id.* Second, deterrence does not justify the harshest sentences; juveniles are immature, reckless, and impetuous, and so "less likely to consider potential punishment." *Id.* at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419. Third, to justify incapacitating a juvenile for life, it would need to be found that the juvenile was incorrigible. *Id.* Incorrigibility, however, is not consistent with youth. *Id.* Finally, rehabilitation does not justify a life sentence. *Id.* In fact, such a long sentence "is at odds with a child's capacity for change." *Id.* at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 420. The Court

found imposing a sentence on a juvenile that "alters the remainder of his life" advances none of these penological justifications. *See id.* at ___, 132 S. Ct. at 2465, 2466, 183 L. Ed. 2d at 420, 421. No one can reasonably argue that a seven-year mandatory minimum sentence imposed on Lyle will "alter the remainder of his life" or that it serves no penological purpose.

While relying heavily on the other two factors, the Court's holding in *Miller* primarily focused on the mandatory nature of the juvenile's life without parole sentence. Mandatory life without parole sentencing schemes prevent judges and juries from considering the juvenile's diminished culpability, the juvenile's capacity for change, and the justifications for a particular sentence. *See id.* at ___, 132 S. Ct. at 2466, 183 L. Ed. 2d at 420 (explaining mandatory life without parole sentencing schemes prevent sentencers "from taking account of these central considerations"). Indeed, by subjecting teens and children to the same sentences as adults, mandatory life without parole sentencing laws "prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Id.* at ___, 132 S. Ct. at 2466, 183 L. Ed. 2d at 420–21. Mandatory life without parole sentencing risks disproportionate sentencing. But, again, we are not talking about our law's harshest term of imprisonment, nor does the majority opinion now base its decision on a disproportionality analysis.

Nevertheless, the Eighth Amendment allows seemingly disproportionate mandatory life-without-parole sentences for adults. *See, e.g., Harmelin v. Michigan,* 501 U.S. 957, 961, 996, 111 S. Ct. 2680, 2683, 2702, 115 L. Ed. 2d 836, 843, 865 (1991) (upholding an adult's sentence of life in prison without parole for possessing more than 650

grams of cocaine). The Court reasoned that for a juvenile, however, a life-without-parole sentence is like a death sentence. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2466, 183 L. Ed. 2d at 421. Like the offender condemned to death, the juvenile imprisoned for life irrevocably forfeits the balance of his life. *See id.* Moreover, the juvenile imprisoned for life is often confined for a larger proportion of his life than his adult counterpart. *Id.* "The penalty when imposed on a teenager, as compared with an older person, is therefore 'the same . . . in name only.'" *Id.* (quoting *Graham*, 560 U.S. at 70, 130 S. Ct. at 2028, 176 L. Ed. 2d at 843). In short, there is a "correspondence" between adult death sentences and juvenile life sentences. *Id.* at ___, 132 S. Ct. at 2467, 183 L. Ed. 2d at 421. This is the lesson in *Miller*, *Null*, and *Pearson*.

Mandatory death sentences for adults are prohibited. *See Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944, 961–62 (1976) (concluding "that the death sentences imposed . . . under North Carolina's mandatory death sentence statute violated the Eighth and Fourteenth Amendments"). The risk in mandatory imposition of the death penalty is, of course, that the penalty is disproportionate. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2467, 183 L. Ed. 2d at 421 (explaining that in *Woodson* the Court found the mandatory-death-penalty scheme flawed because it did not permit considering mitigating factors). Thus, in light of *Graham* and the Court's death-penalty jurisprudence, the Court in *Miller* drew another connection between death sentences and juvenile life sentences. *See id.* at ___, 132 S. Ct. at 2467, 183 L. Ed. 2d at 422 (explaining the death-penalty cases "show the flaws of imposing mandatory life-without-parole sentences on juvenile homicide offenders"). Mandatorily imposing either sentence poses the same risk: disproportionate sentences.

To mitigate this risk in death-penalty cases, sentencing courts must give the defendant an individualized hearing. *See id.* at ___, 132 S. Ct. at 2467, 183 L. Ed. 2d at 421. In *Woodson* and its offspring, the Court underscored the importance of considering individual factors before imposing death. *See id.* at ___, 132 S. Ct. at 2467, 183 L. Ed. 2d at 421–22 (explaining the Court's evolving death-penalty jurisprudence). Considering mitigating factors ensures "the death-penalty is reserved only for the most culpable defendants committing the most serious offenses." *Id.* at ___, 132 S. Ct. at 2467, 183 L. Ed. 2d at 421. On the other hand, failing to consider mitigating circumstances, especially the "signature qualities" of youth, risks sentencing to death an offender who is not deserving of this irrevocable penalty. *See id.* at ___, 132 S. Ct. at 2467, 183 L. Ed. 2d at 422 (internal quotation marks omitted).

Similarly, the Court found imposing a mandatory sentence of life without parole on a juvenile "misses too much." *Id.* at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 422. And likewise, to mitigate the risk of disproportionality in these cases, the Court held a sentencer must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424. Stopping short of barring life sentences without parole for all juvenile offenders, the Court nonetheless opined that "appropriate occasions" for imposing the harshest penalties on juveniles after an individualized hearing "will be uncommon." *Id.*

In rejecting the mandatory minimum sentences imposed in *Pearson* and *Null*, this court relied on the convergence of the same three factors and the need to mitigate the risk of disproportionality. *See Pearson*, 836 N.W.2d at 96 (finding *Miller*'s "reasoning applies equally to"

a "sentence of thirty-five years without the possibility of parole"); *Null*, 836 N.W.2d at 72 (concluding "*Miller*'s principles are fully applicable to a lengthy term-of-years sentence"). First, as in *Miller*, *Graham*, and *Roper*, the offenders in *Pearson* and *Null* were juveniles. *See Pearson*, 836 N.W.2d at 94 (noting Pearson was seventeen at the time she committed her crimes); *Null*, 836 N.W.2d at 45 (noting Null was sixteen at the time he committed his crimes). Next, like the juvenile in *Miller*, both juveniles in *Pearson* and *Null* were subject to mandatory minimum sentences. *Pearson*, 836 N.W.2d at 95 (describing Pearson's challenge to the seventy percent mandatory minimum sentence); *Null*, 836 N.W.2d at 45–46 (noting Null's crimes subjected him to seventy percent mandatory minimums). Finally, though neither Pearson nor Null was sentenced to life without parole, we found both sentences "effectively deprived" both teens of "the possibility of leading a more normal adult life." *Pearson*, 836 N.W.2d at 96–97 (invalidating Pearson's minimum sentence of thirty-five years without parole); *Null*, 836 N.W.2d at 71 (concluding Null's 52.5-year minimum sentence triggered an individualized hearing). Approving these harsh, lengthy sentences, we reasoned, would have ignored juveniles' diminished culpability, their potential for rehabilitation, and the difficulty courts have in identifying irredeemable juveniles. *See Pearson*, 836 N.W.2d at 95–96. These are the principles of our proportionality analysis.

This court, like the United States Supreme Court, signaled fear of the disjunction between lengthy sentences for juveniles and penological justifications for imprisonment. *See Null*, 836 N.W.2d at 65 (explaining the Supreme Court's discussion of penological goals of imprisonment); *see also Miller*, 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419–20 (discussing *Roper*, *Graham*, and the weakness of penological

justifications for imposing lengthy sentences on juveniles). The lesser culpability of Pearson sapped the strength of the retribution rationale, and the qualities of youth that diminish teens' culpability also meant the teen was more likely to disregard the consequences of criminal misconduct, as the Court found in *Miller*. *See Pearson*, 836 N.W.2d at 95–96 (noting juveniles' lesser culpability in relation to adults); *see also Miller*, 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419. Moreover, we held that to lock away Null until old age and Pearson until its cusp, would have required a finding that they were incapable of change, which is not consistent with youth. *See Pearson*, 836 N.W.2d at 96 (noting the inconsistency between incorrigibility and youth); *Null*, 836 N.W.2d at 75, *see also Miller*, 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419.

Finally, even though neither Null nor Pearson was sentenced to life without parole, we held that in neither case did rehabilitation justify the lengthy sentence. In *Null*, we rejected the idea that a "juvenile's potential future release in his or her late sixties after a half century of incarceration" would "provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation' required to obtain release and reenter society." 836 N.W.2d at 71 (quoting *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46). Nor could Pearson demonstrate she had been rehabilitated before reentering society in her sixth decade of life having spent almost four decades behind bars. *See Pearson*, 836 N.W.2d at 96 (rejecting Pearson's thirty-five-year minimum sentence and noting juveniles' potential for rehabilitation). We reasoned we could reasonably expect both teens to have been rehabilitated long before they had served their minimum sentences.

Like Null and Pearson, Andre Lyle was a juvenile at the time he committed his crime, but he was subject to the same mandatory minimum sentence as an adult. In this case, however, the sentence is not harsh, it is not cruel, and it is not unusual. Lyle was sentenced to a maximum prison term of ten years, and he is required to serve seventy percent of that term, or seven years, before being eligible for parole. That minimum is only twenty percent of Pearson's minimum and about thirteen percent of Null's. There is clearly no reasonable correlation between adult death sentences, juvenile life sentences without the possibility of parole, or even the sentences imposed in *Null* and *Pearson*, and this seven-year mandatory minimum sentence. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2467, 183 L. Ed. 2d at 421. As a chronological fact, Lyle's sentence is significantly shorter than all the sentences with which this court or the United States Supreme Court has previously dealt.

Lyle will also reenter society much earlier than either Null or Pearson. Lyle's maximum prison term is far shorter than Pearson's thirty-five-year minimum term. If Lyle served the maximum of ten years, he would be released in his late twenties, about twenty-five years younger than Pearson would have been if she been released when she first became parole eligible. If released when he first becomes parole eligible, Lyle will be in his mid-twenties, which would leave him ample time for hitting major life milestones. Lyle's minimum sentence, unlike the sentences of Null or Pearson, does offer him the chance at "a more normal adult life." *Pearson*, 836 N.W.2d at 96.

Lyle's sentence, unlike that of Pearson or Null, is also justified under penological theories. As in the case of any juvenile, deterrence and retribution offer little support for Lyle's sentence because of his immaturity and diminished culpability. *See Miller*, 567 U.S. at ___, 132

S. Ct. at 2465, 183 L. Ed. 2d at 419. Despite Lyle's youth, however, one cannot dispute that he poses a risk to public safety. Incapacitating him, therefore, protects the public. *See Graham*, 560 U.S. at 72, 130 S. Ct. at 2029, 176 L. Ed. 2d at 844 (explaining incapacitation is an important goal because of the risk recidivism poses to public safety). As with Null or Pearson, Lyle "deserve[s] to be separated from society for some time in order to prevent" him from committing more violent crimes. *Id.* But unlike *Miller*'s life-without-parole sentence, or the lengthy mandatory minimum sentences in *Null* and *Pearson*, mandating Lyle spend seven years in prison does not require the grave judgment "that he would be a risk to society for the rest of his life." *Id.* Incapacitation is thus an appropriate justification for Lyle's sentence.

So too with rehabilitation; it is the "penological goal that forms the basis of parole systems." *Id.* at 73, 130 S. Ct. at 2029, 176 L. Ed. 2d at 845. Lyle's sentence does not deny him the right to reenter society, as was the case in *Graham* and *Miller*, and it does not leave him so few years upon his exit from prison that he cannot demonstrate he has been rehabilitated, as in *Pearson* and *Null*. Imprisoning Lyle until his middle or late twenties does not forswear the "rehabilitative ideal." *Id.* at 74, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845. Lyle's comparatively short sentence does not, unlike the life without parole sentence meted out to the juvenile in *Graham*, deny Lyle "the right to reenter the community." *Id.* And it does not reflect "an irrevocable judgment about [Lyle's] value and place in society." *See id.* Rehabilitation therefore also justifies Lyle's sentence.

Though Lyle was a juvenile when he committed his crime and is mandated to serve seventy percent of his sentence, any similarity between his sentence and the sentences imposed in *Null* or *Pearson* ends

there. Here, Lyle does not face the prospect of geriatric release after decades of incarceration. In fact, Lyle faces at most a single decade behind bars. Lyle will be provided a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" and reenter society as required by *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46, *Pearson*, 836 N.W.2d at 96, and *Null*, 836 N.W.2d at 71. The three factors that converged in *Miller*, *Null*, and *Pearson* do not converge in this case. Therefore, there is no unacceptable risk of disproportionality. I would apply the rationale of *Miller*, *Null*, and *Pearson* and hold the sentence imposed on Lyle is not cruel and unusual under our Iowa Constitution, and thus no individualized sentencing hearing is required.

I also strenuously disagree with the majority's conclusion, in the exercise of its independent judgment, that sentencing juveniles according to a statutorily required mandatory minimum, regardless of the length of the sentence, does not adequately serve legitimate penological objectives in light of the child's categorically diminished culpability. As stated previously, a short-term period of incarceration clearly serves penological goals of rehabilitation and incapacitation, both goals considered important in *Graham* and all of the later cases. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419–20 (discussing incapacitation and rehabilitation in relation to juveniles); *Graham*, 560 U.S. at 72–74, 130 S. Ct. 2029–30, 176 L. Ed. 2d at 844–45 (discussing penological goals of incapacitation and rehabilitation); *Pearson*, 836 N.W.2d at 96 (explaining juveniles are less culpable than adults); *Null*, 836 N.W.2d at 63 (reviewing *Graham*'s discussion of penological goals in relation to juveniles). There is simply no authority for this blanket proposition. Equally important is that this conclusion appears to

squarely contravene the role of the legislature in devising an appropriate sentencing scheme.

But, perhaps most troubling to me is the majority's recognition that every case so far employing this principle of a child's categorically diminished culpability involved harsh, lengthy sentences—even death. In fact, there is no authority cited by the majority, nor did my research disclose any authority, that would extend the principle employed by the majority to all mandatory minimum sentences for juveniles. Undeterred, the majority then emphasizes that nothing the Supreme Court has said is "crime-specific." The majority then extrapolates from this language, "suggesting the natural concomitant that what is said is not punishment-specific either." The majority then cites to our *Pearson* and *Null* opinions from last term to support this proposition. But, neither of these cases was decided on this categorical basis. The language in *Null* is that juveniles are "categorically less culpable than adult offenders *apply as fully in this case as in any other.*" 836 N.W.2d at 71 (emphasis added). This general comment is accurate as to the fifty-two and one-half year mandatory minimum sentence for Null in relation to a life-without-parole sentence utilizing the principles in *Miller*. *Miller* is the basis on which the case was decided. The same logic applies to the quote from the special concurrence in *Pearson*, which recognized the gravity of the offense does not affect the applicability of the juvenile's rights under article I, section 17 of the Iowa Constitution. *See Pearson*, 836 N.W.2d at 99 (Cady, J., concurring specially) (stating "the juvenile offender's decreased culpability plays a role in the commission of both grievous and petty crimes"). This general statement is also accurate in the context of the case in which the length of the sentence itself is being scrutinized as being cruel and unusual. In *Pearson* and *Null,* it was the length of the

mandatory minimum sentences, which we held were the equivalent of life without parole, that failed our constitutional analysis. These general comments, taken out of the context in which the cases were decided, are hardly an endorsement for the proposition that all mandatory juvenile sentences are constitutionally invalid because juveniles are "categorically less culpable." The majority now holds that, in order to meet our constitutional prohibition against cruel and unusual punishment, every juvenile facing a mandatory minimum sentence of any length must have an individualized sentencing hearing utilizing the *Miller* factors. This is wrong and has no constitutional support in federal jurisprudence or our own jurisprudence.

Finally, several observations need to be made in this area of juvenile sentencing. First, no court in the land has followed our opinions in *Pearson* and *Null*, which dramatically extended the circumstances under which a *Miller*-type sentencing hearing was constitutionally required. In my opinion, such an extension was far beyond that contemplated by the United States Supreme Court, and clearly, no other federal court or state supreme court has felt it constitutionally required to extend it either. Second, no federal court, no state supreme court, nor any court for that matter has used a categorical analysis employed by the majority in this case to strike down all mandatory minimum sentences for a juvenile. In reaching this conclusion, the majority contorts our constitutional jurisprudence under the guise of independently analyzing our Iowa Constitution.

Third, the majority justifies its decision in this case by declaring that its decision is based on its desire to return to the district courts its rightful discretion in sentencing juveniles. What the majority fails to comprehend is that these constitutionally unnecessary resentencings

come paired with significant practical difficulties for the district courts. According to statistics obtained from the Iowa Justice Data Warehouse, as of May 31, 2013, I would estimate that more than 100 juveniles were serving mandatory sentences under the previous sentencing scheme. *See* Iowa Dep't of Human Rights, Div. of Criminal & Juvenile Justice Planning, *Current Inmates Under 18 at Time of Offense* (May 31, 2013), available at http://www.humanrights.iowa.gov/cjjp/images/pdf/Prison_ Population_Juvenile_05312013.pdf; *see also* Iowa Code § 902.12(1)–(6) (providing mandatory minimum terms of imprisonment for specific enumerated felonies). Under the previous scheme, the legislature, by mandating minimum sentence lengths for certain crimes, had provided for an efficient, constitutional sentencing proceeding. *See* Iowa Code § 902.12. Based on the majority's opinion, all of those juveniles must be resentenced and have an individualized sentencing hearing. It will take hundreds, if not thousands, of hours to perform this task. And, of course, there will be expert witnesses: social workers, psychologists, psychiatrists, substance-abuse counselors, and any number of related social scientists. And, other witnesses: mothers, fathers, sisters, and brothers. Finally, and most importantly, victims will again have to testify and relive the trauma they experienced at the hands of the juvenile offender. I agree that time and expense should be irrelevant if constitutional rights are affected. However, these should be primary considerations when deciding to impose on the courts and the corrections systems a new sentencing practice that has no basis in this state's constitution. I also question whether the ultimate decisions by our district courts will be qualitatively better given this unnecessary time, money, and effort.

After the parade of witnesses ends, the district court must then produce for each juvenile offender a detailed, reasoned sentencing decision. District courts must consider the "juvenile's lack of maturity, underdeveloped sense of responsibility, vulnerability to peer pressure, and the less fixed nature of the juvenile's character," keeping in mind that these are "mitigating, not aggravating factors" in the decision to impose a sentence. *Null*, 836 N.W.2d at 74–75. It does not end there. District courts must recognize juveniles' capacity for change and "that most juveniles who engage in criminal activity are not destined to become lifelong criminals." *Id.* at 75. If tempted to impose a harsh sentence on even a particularly deserving offender, "the district court should recognize that a lengthy prison sentence . . . is appropriate, if at all, only in rare or uncommon cases." *Id.* To impose that harsh sentence, "the district court should make findings discussing why the" harsh sentence should be imposed. *Id.* at 74. And these are just the factors enumerated by this court in *Null*.

For the district court that is particularly fearful of having a sentencing decision overturned, there are yet more factors that might be considered. *See, e.g., Bear Cloud v. State*, 294 P.3d 36, 47 (Wyo. 2013) (listing factors for sentencing courts to consider, including the juvenile's background and emotional development). For instance, the California Supreme Court has advised that sentencing courts must consider evidence of the juvenile's home environment, evidence of the circumstances of the offense, and evidence of the possibility the prosecutor could have charged the juvenile with some lesser offense. *People v. Gutierrez*, 324 P.3d 245, ___ (Cal. 2014). In sum, "the trial court must consider all relevant evidence" of the distinctive youthful attributes of the juvenile offender. *See id.* at ___. The possibilities are

nearly endless.  But, even if the district court were to consider additional factors, there can be no assurance the district court weighed any particular factor the same way the appellate court would.  And, so more time and money will be spent trying to determine the appropriate sentence for a juvenile offender.  According to the majority, this is what our constitution requires of any juvenile offender.

I understand that the majority believes that an individualized sentencing hearing is the "best practice" for the sentencing of juveniles: "[A]pplying the teachings of *Miller* irrespective of the crime or sentence is simply the right thing to do, whether or not required by our Constitution."   *Pearson,* 836 N.W.2d at 99 (Cady, J., concurring specially).  I do not necessarily disagree.  But, we are not following the teachings of *Miller*, *Null*, or *Pearson*; instead, the majority is deciding this case on a categorical basis and elevating this new "category" to a constitutional right without any cogent, legitimate jurisprudence to support it.  I would hold that the mandatory minimum sentence imposed under Iowa Code section 902.12(5), under these facts, does not constitute cruel and unusual punishment and accordingly does not violate article I, section 17 of the Iowa Constitution.  I would affirm the sentence imposed by the district court.

Waterman and Mansfield, JJ., join this dissent.